UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 630 PENSION-ANNUITY TRUST FUND, Derivatively on Behalf of COMMUNITY HEALTH SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> WAYNE T. SMITH, W. LARRY CASH, T. MARK BUFORD, JOHN A. CLERICO, JAMES S. ELY III, JOHN A. FRY, WILLIAM NORRIS JENNINGS, JULIA B. NORTH, and H. MITCHELL WATSON, JR., <br><br> Defendants, <br><br> – and – <br><br> COMMUNITY HEALTH SYSTEMS, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> JURY TRIAL DEMANDED |

This is a shareholder derivative action brought on behalf of Community Health Systems, Inc. ("Community Health" or the "Company") against certain of its officers and directors for breach of fiduciary duties, corporate waste, and unjust enrichment, which have caused and continue to cause substantial damage to the Company.

## NATURE AND SUMMARY OF THE ACTION

1. Community Health operates 130 general-acute care hospitals in twenty-nine states with approximately 19,000 licensed beds. Community Health also provides hospital management, consulting, and advisory services to more than 150 independent community hospitals and health systems in the United States.

2. The Individual Defendants (as defined herein) are Community Health's executives and directors who have extensive experience working in the U.S. healthcare industry. As the Individual Defendants acknowledge in the Company's fiscal year 2010 annual report, Community Health receives "a substantial portion of [its] revenues from Medicare and Medicaid programs." Indeed, compliance with Medicare and Medicaid regulations is crucial to the continued sustenance of the Company, and failure to comply with such "applicable laws and regulations" may subject Community Health to "criminal penalties and civil sanctions" including the Company "los[ing] [its] ability to participate in these government programs." Thus, the Individual Defendants are intimately familiar with Medicare and Medicaid's requirements and regulations regarding when a company can receive reimbursement for inpatient care.

3. Under federal law, Medicare reimburses hospitals for treatment that is "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C.A. §1395y(a)(1)(A). However, pursuant to federal regulations, Medicare disallows payment for services that were not "medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary." Medicare Program Integrity Manual, Chapter 6, Section 6.5.2 (2009). As such,

inpatient care is only appropriate "if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care was provided in a less intensive setting."

4. On April 11, 2011, shareholders were surprised to find out that the Individual Defendants had breached their fiduciary duties of loyalty and good faith by causing Community Health to ignore Medicare regulations by developing admission criteria that systematically steered patients into medically unnecessary, inpatient admissions when those patients should have been safely and effectively treated as outpatients in observation status. As a result, the Individual Defendants caused the Company to overbill its patients for inpatient admissions, reaping improper payments of approximately \$280 million to \$377 million, between 2006 and 2009.

5. This amount, however, pales in comparison to the fines and liability the Company now faces. In fact, by some estimates, Community Health may be subject to liability and damages of well over \$1 billion due to the Individual Defendants' fiduciary failures. The Individual Defendants' actions have also subjected the Company to a complex and expensive-to-defend securities class action lawsuit as well as a lawsuit by its direct competitor, Tenet Healthcare Corporation ("Tenet").

6. The Individual Defendants also made, or caused the Company to make, improper statements that overstated Community Health's revenues derived from Medicare and Medicaid reimbursements. These statements effectively deceived the investing public and artificially inflated the Company's stock. In turn, defendants Wayne T. Smith ("Smith"), W. Larry Cash ("Cash"), and T. Mark Buford ("Buford") utilized their knowledge of the Company's true financial results and inflated stocks price for their own benefit by selling over *\$36.5 million worth of their personally-held stock*, while in possession of material, adverse non-public information.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C.A §1331 because this case involves alleged violations of federal law by the defendants including 42 U.S.C.A §1395y(a)(1)(A) and Federal False Claims Act ("FCA") 31 U.S.C.A §3729.

8. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to 28 U.S.C.A §1391(a) because: (i) Community Health maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Community Health occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

10. Plaintiff Plumbers and Pipefitters Local Union 630 Pension Annuity Trust Fund was a shareholder of Community Health at the time of the continuing wrong complained of. The continuing wrong included causing the Company to engage in illegal business practices by overbilling Medicare, Medicaid, and other payers, and the issuance of improper statements regarding the Company's financial results and business operations. Once plaintiff became a shareholder, it has continuously been a shareholder.

11.     Nominal defendant Community Health is a Delaware corporation with its executive offices located at 4000 Meridian Boulevard, Franklin, Tennessee 37067. Community Health is a leading operator of general acute care hospitals in non-urban and selected urban markets throughout the country. Through its subsidiaries, Community Health owns, leases, or operates 133 hospitals in twenty-nine states with an aggregate of approximately 19,500 licensed beds.

12.     Defendant Smith has been Chairman of Community Health's Board of Directors (the "Board") since 2001 and a director since 1997. He has also been Community Health's President and Chief Executive Officer ("CEO") since 1997. In addition to Community Health, Smith has been an executive and/or director of several companies and organizations operating in the healthcare industry, including Humana, Inc. ("Humana"), the Nashville Healthcare Council, and the Federation of American Hospitals. Defendant Smith knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly, recklessly, or with gross negligence caused the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Smith also knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices. While in possession of material, non-public information concerning Community Health's true business operations, defendant Smith sold 500,000 shares of his Community Health stock for $16,770,301.45 in proceeds.

13.     Defendant Cash has been a Community Health director since 2001. He has also been Community Health's Chief Financial Officer ("CFO") and Executive Vice President since

1997. In addition to Community Health, Cash has been an executive and/or director of several companies operating in the healthcare industry, including Columbia/HCA Healthcare Corporation, Humana, and Cross Country Healthcare, Inc. Defendant Cash knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly, recklessly, or with gross negligence caused the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Cash also knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices. While in possession of material, non-public information concerning Community Health's true business operations, defendant Cash sold 480,000 shares of his Community Health stock for $17,069,760.00 in proceeds.

14.     Defendant Buford has been Community Health's Senior Vice President since at least March 2010 and Chief Accounting Officer since at least June 2009. He has also served as Community Health's Corporate Controller since 1986 and as Vice President since 1988. Defendant Buford knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly, recklessly, or with gross negligence caused the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Buford also knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices. While in possession of material, non-public

information concerning Community Health's true business operations, defendant Buford sold 74,261 shares of his Community Health stock for $2,665,469.10 in proceeds.

15. Defendant John A. Clerico ("Clerico") has been a Community Health director since 2003. He is also Chairman of Community Health's Audit and Compliance Committee and a member of its Compensation Committee. Defendant Clerico knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Clerico knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.

16. Defendant James S. Ely III ("Ely") has been a Community Health director since 2009. He is also a member of Community Health's Audit and Compliance Committee. In addition to Community Health, Ely has been an executive and/or director of other companies operating in the healthcare industry, including Select Medical Corporation. Defendant Ely knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Ely also knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.

-6-

17.     Defendant John A. Fry ("Fry") has been a Community Health director since 2004. He is also a member of Community Health's Audit and Compliance and Governance and Nominating Committees. Defendant Fry knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Fry also knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.

18.     Defendant William Norris Jennings ("Jennings") has been a Community Health director since 2008. He is also a member of Community Health's Governance and Nominating Committee. In addition to Community Health, Jennings has extensive healthcare experience, including serving as a practicing family medicine physician employed by The Physician Group. Defendant Jennings knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Jennings also knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.

19.     Defendant Julia B. North ("North") has been a Community Health director since 2004. She is also Chairman of Community Health's Governance and Nominating Committee

and a member of its Compensation Committee. Defendant North knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, she knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant North also knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.

20. Defendant H. Mitchell Watson, Jr. ("Watson") has been a Community Health director since 2004. He is also Chairman of Community Health's Compensation Committee. Defendant Watson knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Watson also knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.

21. The defendants named above in ¶¶12-20 are sometimes collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

22. It is well established that the fiduciaries of publicly traded corporations owe a duty to the corporation they are elected to serve. This duty includes two separate fiduciary duties: a duty of care and a duty of loyalty. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911

A.2d 362 (Del. 2006). Each officer and director of Community Health owed the Company and its shareholders the duty to exercise a high degree of care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Community Health's officers and directors complained of herein involves a knowing, intentional, and culpable violation of their obligations as fiduciaries of Community Health and the absence of good faith on their part for their duties to the Company and its shareholders.

23. The Individual Defendants knew that, as Community Health's officers and directors, it was their obligation to ensure that the Company was accurately billing for Medicare and Medicaid reimbursements and not misleading the investing public by reporting improper revenue. Indeed, a number of Community Health's directors were nominated for election to the Community Health Board specifically because of their extensive industry and business management experience. For example, as Community Health states in its 2010 Proxy Statement, dated April 7, 2011:

- defendant Smith "is one of the most tenured executives in the healthcare industry, with decades of experience in both the hospital sector and the managed care sector";

- defendant Cash has "prior managed care experience [and] brings that perspective to [the] Board's deliberations and evaluation of its business and strategy";

- defendant Ely has a strong "educational background (MBA in finance and accounting from the University of Chicago) and extensive (over twenty years) experience in the financing industry, and in the healthcare sector in particular";

- defendant Jennings "brings practitioner insight to quality measures and reporting, electronic health record implementation, and federal government regulation of practitioner-hospital relationships"; and

- defendant Watson "has extensive audit committee experience with a variety of different types of companies and he imparts those concepts to the oversight of the Company's financial management and audit functions."

24.     The Company also had in place a Code of Conduct (the "Code"). The Code claims that the Company is dedicated to "compliance with all federal, state, and local laws, rules, and regulations, including...billing." Pursuant to the Code, officers and directors are required to conduct their business affairs "with the highest ethical and legal standards." As for billing, the Code states that "colleagues shall not engage in any intentional deception or misrepresentation intended to influence any entitlement or payment under any federal healthcare benefit program" and that "all individuals responsible for coding and billing for services will adhere to all official coding billing guidelines, rules, regulations, statutes, and laws." Further, failure to adhere to the Code is grounds for disciplinary action, including termination.

25.     The Company's Compliance Policy on Preventing, Deleting and Reporting Fraud, Waste, and Abuse (the "Policy") contains an entire section devoted to FCA violations. This section provides a list of actions that would run afoul of the FCA and the Policy, including: (i) knowingly filing "a false or fraudulent claim for payment to Medicare, Medicaid or any other federally funded health care program"; (ii) knowingly using "a false record or statement to obtain payment on a false or fraudulent claim from Medicare, Medicaid or any other federally funded health care program"; (iii) conspiring "to defraud Medicare, Medicaid or any other federally funded health care program by attempting to have a false or fraudulent claim paid"; or (iv) knowingly using "a false record or statement to conceal, avoid, or decrease an obligation to pay money or transmit property to the Federal Government." In particular, the Policy specifically states that a "false claim may include overbilling for a product or service." Finally, the Policy sets forth the consequences of violating the FCA, including "[f]ines between $5,500 and $11,000 plus three times the amount of damages sustained by the government for each false claim."

26.     Accordingly, the Individual Defendants, at all relevant times, knew: (i) the risks associated with establishing admissions criteria that improperly steered patients to costly

inpatient admissions at Community Health hospitals in order to collect unwarranted reimbursements from Medicare and other payer sources; and (ii) that Community Health could incur significant penalties and liability arising from federal and state investigations and proceedings, as well as private lawsuits and loss of goodwill, if they did not comply with applicable rules and regulations, other legal obligations, and widely accepted standards of clinical care.

**Audit and Compliance Committee Duties**

27. In addition to these duties, under Community Health's Board's Audit and Compliance Committee Charter (the "Audit Committee Charter") adopted and in effect since at least 2001, defendants Clerico, Ely, and Fry, otherwise referred to as the "Audit Committee Defendants," owed specific duties to the Company. According to the Audit Committee Charter, the Audit Committee Defendants were responsible for assisting the Board in its oversight of "the integrity of the Company's financial statements" and its "compliance with its legal and regulatory requirements." The Audit Committee Defendants also had specific duties to "discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies prior to their release." Finally, the Audit Committee Defendants were required to advise the Board on the policies and procedures of the Corporate Compliance program.

## AIDING AND ABETTING

28. In committing the wrongful acts particularized herein, the Individual Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

29. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist the

commission of the wrongdoing detailed herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

30.     Community Health is a healthcare company that owns, operates, or leases community hospitals that offer cost-effective healthcare, including a range of inpatient medical and surgical services, outpatient treatment, and skilled nursing care. It is incorporated under the laws of the state of Delaware and its securities are publicly traded on the New York Stock Exchange under the symbol "CYH."

31.     This lawsuit arises out of the Individual Defendants' breach of fiduciary duties of loyalty and good faith by causing Community Health to blatantly disregard Medicare and Medicaid regulations.    In particular, Individual Defendants developed and implemented admission criteria that systematically steered patients into medically unnecessary, inpatient admissions instead of treating these patients as outpatients in "observations" status as was clinically required. The Individual Defendants' continuing and ongoing scheme to collect on billings from lucrative inpatient admissions allowed Community Health to receive hundreds of millions of dollars' worth of unwarranted Medicare payouts, as well as likely payouts from other payer sources. The Individual Defendants then touted these overstated Medicare and Medicaid reimbursement revenues in the Company's public filings which artificially inflated the Company's stock.

**Industry Standard for Treating Patients According to Need**

32.     When a patient enters a hospital, physicians generally have three options when it comes to treating the patient. First, for the most serious cases, a patient may be admitted to the hospital so that the patient may receive care that is expected to last for twenty-four hours or more. Second, when a patient's medical status does not necessarily require inpatient treatment,

but additional monitoring and assessment is required to appropriately care for the patient, a patient is placed into outpatient observation status for care and monitoring that is expected to last less than twenty-four hours, but which may take as long as forty-eight hours if the physician is unable to make a determination within a twenty-four hour period. Observation patients are regularly assessed by hospital staff during the course of their stay – often receiving the identical care or treatment as patients who are admitted to the hospital – until the physician determines that there is no medical need for the patient to remain in the hospital or that the patient should be admitted. Third, for patients with relatively minor medical needs, physicians and nurses may provide treatment on an outpatient basis and discharge the patient without that patient being admitted into the hospital or placed into observation.

33. The use of observation status to treat patients is widely recognized as an essential tool for improving clinical decision-making and providing cost-effective medical care. Pursuant to the Medicare Benefit Policy Manual:

> Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital. Observation services are commonly ordered for patients who present to the emergency department and who then require a significant period of treatment or monitoring in order to make a decision concerning their admission or discharge.

Medicare Benefit Policy Manual, Chapter 6, Section 20.6A (2010).

34. Generally, observation care is appropriate for patients whose medical conditions (such as chest pain or abdominal pain) require diagnostic evaluation because: (i) the balance between the probability of the disease and the dangerousness of the disease warrants further evaluation; (ii) the patient presents a condition that cannot be readily diagnosed without additional testing; or (iii) the physician simply needs more time to evaluate the patient's symptoms to determine the most appropriate medical treatment.

35.    Observation care is also appropriate for patients who require short-term treatment of emergent conditions. These are patients with conditions for which there is a high probability of therapeutic success with limited amount of services, such as patients with asthma, dehydration, or an infection. In addition, patients who require therapeutic procedures that do not necessitate inpatient admissions, but who nonetheless require some period of hospital care, are best treated in observation.    For certain procedures performed for therapeutic (such as transfusions) or diagnostic (such as angiograms) reasons, observation treatment can expedite the performance of these procedures.

36.    Since many patients' conditions improve through quick, aggressive treatment, and because testing may eliminate serious risks and allows patients to return home, the vast majority of observation patients are sent home without ever being admitted to the hospital. In addition, with shorter stays and typically less testing and treatments for observation patients as compared to admitted patients, observation care can be very cost-effective for payers.

37.    The decision of whether to treat a patient on an inpatient or outpatient observation basis has significant financial ramifications for the hospital.    Indeed, according to the independent Medicare Payment Advisory Commission ("MedPAC"), a hospital may receive Medicare reimbursement of nearly 1000% more (or approximately $7000 more per patient) for treatment and billing of an admitted chest-pain patient on an inpatient admitted basis as compared to what the hospital would receive by treating and billing the patient in outpatient observation status.    MedPAC, *Recent Growth in Hospital Observation Care* (Sept. 13, 2010), http://www.medpac.gov/transcripts/observation%20sept%202010.pdf.        Accordingly, hospitals have a strong financial incentive to steer patients into lucrative (but costly to the patients and their insurers) inpatient admissions rather than treat patients on an observation basis notwithstanding the patients' appropriate clinical evaluation.    Hence, these hospitals must

implement certain internal controls and employ safeguards to ensure patient treatment and their applicable billing practices are determined based on appropriate clinical evaluations rather than profit maximization motives.

## Defendants' Policy of Improperly Driving Inpatient Admissions to Boost Medicare Reimbursements

38.     Under federal law, Medicare reimburses hospitals for treatment that is "reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C.A §1395y(a)(1)(A). Additionally, Medicare disallows payment for services that were not "medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary."   Medicare Program Integrity Manual, Chapter 6, Section 6.5.2.  Thus, inpatient care is only appropriate "if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care was provided in a less intensive setting."  *Id.*

39.     Medicare guidelines additionally require that hospitals maintain a set of admissions criteria for determining whether a patient's condition is serious enough to warrant inpatient treatment.  In contravention of Medicare rules and widely accepted industry standards, the Individual Defendants caused Community Health to develop admissions criteria that systematically steered medically unnecessary, inpatient admissions at its hospitals, improperly increasing its total inpatient admissions, and ultimately resulting in the overbilling of and unwarranted reimbursement from Medicare and other payer sources.

40.     In or around 2000, the Individual Defendants developed a set of admissions criteria for Community Health known as the "Blue Book" for Community Health physicians and case managers to use in order to provide guidance in the admission of a patient into a Community Health hospital.  Unlike the other detailed evidence-based guidelines developed by independent medical professionals and followed by over 75% of hospitals in the United States, the Blue Book is a relatively short document with little or no reference to medical literature, and

has never been subject to external testing or extensive scrutiny by physicians unaffiliated with Community Health.

41.     In addition, the Blue Book's criteria for admitting patients into a Community Health hospital are significantly more lenient, general, and subjective than the evidence-based and objective criteria used by the rest of the hospitals in the healthcare industry. The Blue Book is organized around the most common patient conditions presented at Community Health hospitals (e.g., chest pain, asthma, and congestive heart failure) and presents a series of "Admission Justification[s]" designed to facilitate and maximize inpatient admissions.

42.     The very structure of the Blue Book – with its focus on "Admission Justification" – demonstrates that it is not an objective set of criteria for determining the propriety of treating a patient in observation as opposed to admitting the patient into the hospital. For many conditions that are common among Medicare patients, the Blue Book includes "Admission Justification" criteria that bear little relevance to determining the severity of a patient's condition, are at odds with standard clinical decision-making for determining the proper level of care for patients, and provide an improper clinical basis for admitting a patient into the hospital. Moreover, in many cases, the Blue Book simply fails to include the core criteria utilized by physicians to determine, for a given condition, whether the patient's presenting symptoms are serious enough to require admission into the hospital.

43.     The Individual Defendants incorporated in the Blue Book a significantly more subjective and liberal criteria for admitting patients than the accepted clinical decision-making and evidence-based, clinical criteria used by peer hospital systems across the country. This allowed the Company to funnel more of its patients to inpatient care, in comparison to other hospitals that spurned the Blue Book's subjective and highly discretionary guidelines, and properly admitted patients based on clinical need.

44.     The Individual Defendants also established policies and procedures at Community Health in which inpatient admissions were the default position, and assigning patients to observation status was highly discouraged, even in cases where diagnostic testing or short-term treatment was the medically appropriate and best course of care for the patient. Often times, patients were admitted when there was no medical need to admit the patient to the hospital. Indeed, the clinically appropriate decision was to place the patient into observation, run the necessary tests or provide the necessary treatment that would allow the physician to rule out a more serious condition, and then discharge the patient. In the event that the tests or treatment did not eliminate the more serious condition, the physician would then admit the patient to the hospital for further treatment. However, the Blue Book flipped the medical practice on its head by steering the admission of these patients immediately into Community Health hospitals, quickly discharging the patients after tests and/or treatment ruled out the serious condition, and then billing Medicare for the far more expensive – and wholly unnecessary – inpatient treatment.

45.     The Individual Defendants ignored Medicare regulations by creating criteria and enforcing practices under which the admissions criteria applied by its physicians directed them to improperly recommend inpatient admission and overbill Medicare and other payer sources accordingly, when such costly treatment was neither "reasonable and necessary" nor "medically necessary." This resulted in Community Health hospitals improperly admitting approximately 62,000 to 82,000 Medicare patients from 2006-2009, and approximately 20,000 to 31,000 in 2009 alone.

## THE INDIVIDUAL DEFENDANTS' IMPROPER STATEMENTS

46.     On February 20, 2007, the Individual Defendants caused Community Health to file with the SEC its Form 10-K for the year ended 2006. In the 10-K, defendants Smith, Cash, Buford, Clerico, Fry, North, and Watson stated that "[i]n 2006, 41.7% of [the Company's] net

operating revenues came from the Medicare and Medicaid programs." The 10-K further provided:

> We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements. Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously.

* * *

> ***Since a substantial portion of our revenue comes from patients under Medicare and Medicaid*** programs, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.

* * *

> The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels. Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws. There are also extensive regulations governing a hospital's participation in these government programs. ***If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government programs.*** In addition, government regulations may change. If that happens, we may have to make changes in our facilities, equipment, personnel, and services so that our hospitals remain certified as hospitals and qualified to participate in these programs. We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards.

* * *

> In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

47.     On April 26, 2007, the Individual Defendants caused Community Health to file with the SEC its first quarter 2007 Form 10-Q. Defendants Smith, Cash, and Buford estimated reimbursement from the Medicare and Medicaid programs to constitute 41.4% of the Company's net operating revenue for the quarter.

48.     On July 31, 2007, the Individual Defendants caused Community Health to file with the SEC its second quarter 2007 Form 10-Q. Defendants Smith, Cash, and Buford estimated reimbursement from the Medicare and Medicaid programs to constitute 41.1% of the Company's net operating revenue for the quarter.

49.     On November 2, 2007, the Individual Defendants caused Community Health to file with the SEC its third quarter 2007 Form 10-Q. Defendants Smith, Cash, and Buford estimated reimbursement from the Medicare and Medicaid programs to constitute 38.4% of the Company's net operating revenue for the quarter.

50.     On February 29, 2008, the Individual Defendants caused Community Health to file with the SEC its Form 10-K for year ended 2007. Defendants Smith, Cash, Buford, Clerico, Fry, North, and Watson reported that "[i]n 2007, 39.3% of [the Company's] net operating revenues came from the Medicare and Medicaid programs." The 10-K further provided:

> We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements. Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously.
>
> * * *
>
> Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.
>
> * * *
>
> The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels. Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws. There are also extensive regulations governing a hospital's participation in these government programs. If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government

programs. In addition, government regulations may change. If that happens, we may have to make changes in our facilities, equipment, personnel, and services so that our hospitals remain certified as hospitals and qualified to participate in these programs. We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards.

*  *  *

In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

51.     On May 2, 2008, the Individual Defendants caused Community Health to file with the SEC its first quarter 2008 Form 10-Q. Defendants Smith, Cash, and Buford estimated reimbursement from the Medicare and Medicaid programs to constitute 36.8% of the Company's net operating revenue for the quarter.

52.     On August 5, 2008, the Individual Defendants caused Community Health to file with the SEC its second quarter 2008 Form 10-Q. Defendants Smith, Cash, and Buford estimated reimbursement from the Medicare and Medicaid programs to constitute 36.2% of the Company's net operating revenue for the quarter.

53.     On October 31, 2008, the Individual Defendants caused Community Health to file with the SEC its third quarter 2008 Form 10-Q. Defendants Smith, Cash, and Buford estimated reimbursement from the Medicare and Medicaid programs to constitute 35.5% of the Company's net operating revenue for the quarter.

54.     On February 27, 2009, the Individual Defendants caused Community Health to file with the SEC its Form 10-K for year ended 2008. Defendants Smith, Cash, Buford, Clerico, Fry, Jennings, North, and Watson claimed that "[i]n 2008, 36.6% of [the Company's] net operating revenues came from the Medicare and Medicaid programs." The 10-K further provided:

> We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements. Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously.

* * *

Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.

* * *

The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels. Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws. There are also extensive regulations governing a hospital's participation in these government programs. If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government programs. In addition, government regulations may change. If that happens, we may have to make changes in our facilities, equipment, personnel, and services so that our hospitals remain certified as hospitals and qualified to participate in these programs. We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards.

* * *

In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

55.     On April 29, 2009, the Individual Defendants caused Community Health to file with the SEC its first quarter 2009 Form 10-Q. Defendants Smith, Cash, and Buford stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement to constitute 36.2% of net operating revenue for the quarter.

56.     On July 31, 2009, the Individual Defendants caused Community Health to file with the SEC its second quarter 2009 Form 10-Q. Defendants Smith, Cash, and Buford stated that the Company receives "a substantial portion of [its] revenues from the Medicare and

Medicaid programs" and estimated that reimbursement to constitute 36.2% of net operating revenue for the quarter.

57.    On October 30, 2009, the Individual Defendants caused Community Health to file with the SEC its third quarter 2009 Form 10-Q. Defendants Smith, Cash, and Buford stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement to constitute 37.1% of net operating revenue for the quarter.

58.    On February 26, 2010, the Individual Defendants caused Community Health to file with the SEC its Form 10-K for year ended 2009. Defendants Smith, Cash, Buford, Clerico, Ely, Fry, Jennings, North, and Watson stated "[i]n 2009, 36.9% of [the Company's] net operating revenues came from the Medicare and Medicaid programs." The 10-K further provided:

> We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements. Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously.
>
> * * *
>
> Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.
>
> * * *
>
> The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels. Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws. There are also extensive regulations governing a hospital's participation in these government programs. If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government programs. In addition, government regulations may change. If that happens, we may have to make changes in our facilities, equipment, personnel, and services so

that our hospitals remain certified as hospitals and qualified to participate in these programs. We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards.

* * *

In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

59. On April 28, 2010, the Individual Defendants caused Community Health to file with the SEC its first quarter 2010 Form 10-Q. Defendants Smith, Cash, and Buford stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement to constitute 37.8% of net operating revenue for the quarter.

60. On July 30, 2010, the Individual Defendants caused Community Health to file with the SEC its second quarter 2010 Form 10-Q. Defendants Smith, Cash, and Buford stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement to constitute 38.2% of net operating revenue for the quarter.

61. On October 29, 2010, the Individual Defendants caused Community Health to file with the SEC its third quarter 2010 Form 10-Q. Defendants Smith, Cash, and Buford stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement to constitute 38% of net operating revenue for the quarter.

62. On February 25, 2011, the Individual Defendants caused Community Health to file with the SEC its Form 10-K for year ended 2010. Defendants Smith, Cash, Buford, Clerico, Fry, Jennings, North, and Watson stated that "[i]n 2010, 37.8% of [the Company's] net operating revenues came from the Medicare and Medicaid programs." The 10-K further provided:

We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory

requirements. Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously.

* * *

Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.

* * *

The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels. Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws. There are also extensive regulations governing a hospital's participation in these government programs. If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government programs. In addition, government regulations may change. If that happens, we may have to make changes in our facilities, equipment, personnel, and services so that our hospitals remain certified as hospitals and qualified to participate in these programs. We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards.

* * *

In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

63. On April 29, 2011, the Individual Defendants caused Community Health to file with the SEC its first quarter 2011 Form 10-Q. Defendants Smith, Cash, and Buford stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement to constitute 37.1% of net operating revenue for the quarter.

64. The above statements were improper and therefore a breach of the Individual Defendants' fiduciary duties owed to Community Health. At the time that each of these statements was made, the Individual Defendants knew or should have known that Community

Health was required to comply with Medicare reimbursement standards as well as related Medicaid requirements. Nonetheless, under the Individual Defendants' management and control, Community Health implemented admissions criteria to systematically steer medically unnecessary, inpatient admissions at Community Health hospitals. Because this artificial increase in inpatient admissions resulted in substantially higher and unwarranted reimbursements from Medicare and Medicaid, the Medicare and Medicaid reimbursements actually constituted a much smaller percentage of the Company's revenue.

### THE INDIVDUAL DEFENDANTS' UNLAWFUL INSIDER-SELLING

65.    The Individual Defendants' knowledge of Community Health's improper inpatient-admissions and billing practices is also shown in their sales of personally-held Company stock. The Individual Defendants were privy to adverse, non-public information which they exploited for their own benefit, to the exclusion of other shareholders, by selling their Company stockholdings before the truth came to light. While continuously making improper statements touting Community Health's revenues derived from improper Medicare and Medicaid reimbursements, certain Individual Defendants sold massive amounts of Company stock in order to capitalize on the Company's inflated stock price that they had helped create.

66.    Combined, defendants Cash, Smith, and Buford sold over to $36.5 million worth of their Company stock during the relevant period from the first improper statement made by Individual Defendants on February 20, 2007, to when the truth came out on April 11, 2011. Defendants Cash, Smith, and Buford's illicit stock sales are detailed below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BUFORD | 5/2/2008 | 12,000 | $36.35 | $436,200.00 |
| | 4/28/2009 | 10,000 | $20.59 | $205,900.00 |
| | 8/4/2009 | 10,000 | $30.94 | $309,400.00 |
| | 4/26/2010 | 13,334 | $40.66 | $542,223.11 |
| | 4/26/2010 | 28,927 | $40.51 | $1,171,745.99 |
| | | 74,261 | | $2,665,469.10 |

| | | | | |
|---|---|---|---|---|
| **CASH** | 8/4/2009 | 240,000 | $30.79 | $7,388,400.00 |
| | 4/26/2010 | 240,000 | $40.34 | $9,681,360.00 |
| | | **480,000** | | **$17,069,760.00** |
| | | | | |
| **SMITH** | 5/20/2009 | 250,000 | $26.07 | $6,518,650.00 |
| | 5/13/2010 | 243,093 | $41.02 | $9,971,917.95 |
| | 5/14/2010 | 6,907 | $40.50 | $279,733.50 |
| | | **500,000** | | **$16,770,301.45** |
| | | | | |
| **TOTAL** | | **1,054,261** | | **$36,505,530.55** |

## DAMAGES TO COMMUNITY HEALTH

67.     As a result of the Individual Defendants' misconduct and improper statements, Community Health has already incurred significant damages, and the ensuing cost to the Company will only grow worse. The Company's violations of Medicare regulations and widely accepted standards of patient care have exposed Community Health to significant costs, expenses, damages, fines, and the risk of exclusion from the Medicare program.

68.     The Individual Defendants' improper and unsustainable inpatient-admission practices have, and will continue to, severely harm the Company. The Individual Defendants caused Community Health to systematically overbill Medicare and other payers by causing patients to be admitted to Community Health hospitals when industry practice is to treat them in outpatient observation. From 2006-2009, the Company likely received between $280 million and $377 million from the inpatient treatment of these improperly admitted Medicare patients. In turn, Community Health is in danger of incurring significant liability arising from its improper Medicare-billing practices which include treble damages and a penalty of up to $11,000 per false claim. In addition, the Individual Defendants have jeopardized the Company's eligibility to participate in the Medicare program which would severely impact its potential future earnings. The Individual Defendants' misconduct also resulted in similar improper reimbursements from private payers and state Medicare and Medicaid programs that the Company will likely have to relinquish.

69.     As a consequence of the Individual Defendants' faulty inpatient-admissions and billings practices, Community Health's hospital in Laredo, Texas has come under investigation by the Office of Inspector General of the U.S. Department of Health and Human Services ("DHHS"), which has requested documents related to matters including "case management, resource management, admission criteria, patient medical records, coding [and] billing. . . ." Specifically, on February 25, 2011, the Individual Defendants caused Community Health to file its Form 10-K with the SEC which stated:

> On December 7, 2009, we received a document subpoena from the U.S. Department of Health and Human Services, Office of the Inspector General, or OIG, requesting documents related to our hospital in Laredo, Texas. The categories of documents requested included case management, resource management, admission criteria, patient medical records, coding, billing, compliance, the Joint Commission accreditation, physician documentation, payments to referral sources, transactions involving physicians, disproportionate share hospital status, and audits by the hospital's Quality Improvement organization. On January 22, 2010, we received a "request for information or assistance" from the OIG's Office of Investigation requesting patient medical records from Laredo Medical Center in Laredo, Texas for certain Medicaid patients with an extended length of stay. Additional requests for records have also been received, including a request containing follow-up questions received on January 5, 2011. We are cooperating fully with these investigations.

70.     In addition, as a further consequence of the Individual Defendants' faulty inpatient-admissions and billings practices, Community Health faces an investigation by the Texas Attorney General concerning "emergency department procedures and billing" at each of its eighteen Texas hospitals. Specifically, the Form 10-K stated:

> On November 15, 2010, we were served with substantially identical Civil Investigative Demands (CIDs) from the Office of Attorney General, State of Texas for all our 18 affiliated Texas hospitals. The subject of the requests appears to concern emergency department procedures and billing. We are cooperating fully with these requests. Because we are in the early stages of this investigation, we are unable to evaluate the outcome of this investigation.

71.     The Individual Defendants' actions have also exposed Community Health to a lawsuit for violations of the federal securities laws brought by Tenet, *Tenet Healthcare Corporation v. Community Health Systems, Inc., et al.*, 3:11-cv-00732-M (N.D. Texas). In the

lawsuit filed April 11, 2011, Tenet alleges that Community Health made material misstatements and omissions about its inpatient-admissions practices while attempting to acquire Tenet. These false and misleading statements in Community Health's proxy statements and other SEC filings likely violated federal securities laws. In addition, the false and misleading statements have also exposed the Company to potential expensive-to-defend securities class action lawsuits.

72. On April 11, 2011, the day that Tenet filed its lawsuit, Community Health's stock price sank 36%, or by $14.41 per share, the biggest one-day decline since the Company first offered shares to the public on June 8, 2000. The Company's staggering drop in market capitalization has decimated its bottom line and eliminated any chance Community Health had at acquiring Tenet.

73. Moreover, as a further consequence of the Individual Defendants' faulty inpatient-admissions and billings practices, Community Health received a subpoena from the DHHS requesting documents relating to emergency department procedures. Specifically, on April 15, 2011, the Individual Defendants caused Community Health to file an SEC Form 8-K which stated:

> On Friday, April 8, 2011, Community Health Systems, Inc. received a document subpoena, dated March 31, 2011, from the U.S. Department of Health and Human Services, Office of the Inspector General (the "OIG"), in connection with an investigation of possible improper claims submitted to Medicare and Medicaid. The subpoena, issued from the OIG's Chicago, Illinois office, requests documents from all of our hospitals and appears to concern emergency department processes and procedures, including our hospitals' use of the Pro-MED Clinical Information System, which is a third-party software system that assists with the management of patient care and provides operational support and data collection for emergency department management and has the ability to track discharge, transfer, and admission recommendations of emergency department physicians. The subpoena also requests other information about our relationships with emergency department physicians, including financial arrangements. The subpoena's requests are very similar to those contained in the Civil Investigative Demands received by our Texas hospitals from the Office of the Attorney General of the State of Texas on November 15, 2010 (and disclosed in our Annual Report on Form 10-K for the year ended December 31, 2010, p. 39). We do not know if the subpoena is related in any way to the allegations contained in the lawsuit styled

*Tenet Healthcare Corporation vs. Community Health Systems, Inc., et al.* (No. 3:11-cv-00732-M) filed in the U.S. District Court for the Northern District of Texas on April 11, 2011. We are cooperating fully with the OIG in connection with this subpoena and are currently unable to predict the outcome of this investigation.

74. The Individual Defendants' faulty inpatient-admissions and billings practices have also caused Community Health to face a potential lawsuit brought under the FCA resulting from Medicare billing practices at one of its Indiana hospitals. Specifically, on April 22, 2011, the Individual Defendants caused Community Health to file an SEC Form 8-K which stated:

> Today, Community Health Systems, Inc. (the "Company") was contacted by the U.S. Department of Justice regarding a complaint styled *United States ex rel. Reuille vs. Community Health Systems Professional Services Corporation and Lutheran Musculosskeletal Center, LLC d/b/a Lutheran Hospital*, filed in the Northern District of Indiana, Fort Wayne Division. The lawsuit was originally filed under seal on January 7, 2009. The suit is brought under the False Claims Act and alleges that Lutheran Hospital of Indiana billed the Medicare program for (a) false 23 hour observation after outpatient surgeries and procedures, and (b) intentional assignment of inpatient status to one-day stays for cases that do not meet Medicare criteria for inpatient intensity of service or severity of illness. The relator had worked in the case management department of Lutheran Hospital of Indiana but was reassigned to another department in the fall of 2006. This facility was acquired by the Company as part of the July 25, 2007 merger transaction with Triad Hospitals, Inc. The complaint also includes allegations of age discrimination in Ms. Reuille's 2006 reassignment and retaliation in connection with her resignation on October 1, 2008. The Company had cooperated fully with the government in its investigation of this matter, but had been unaware of the exact nature of the allegations in the complaint.
>
> On December 27, 2010, the government filed a notice that it declined to intervene in this suit. That same day, an order was filed directing that the complaint be unsealed and served on the defendants by the relator. The suit has not been served on the defendants and the Company was not notified of these orders. Also today, April 22, 2011, the government advised the Company that it is considering this suit in light of the investigation that is the subject of the subpoena we received from the U.S. Department of Health and Human Services, Office of the Inspector General, on April 8, 2011. We are cooperating with them in that evaluation.

75. Worse, the United States Department of Justice ("DOJ") has decided to intervene in the FCA action. The DOJ disclosed that it consolidated the related federal investigations into improper billing for inpatient care at Community Health hospitals. Specifically, on April 25,

2011, the Individual Defendants caused Community Health to file an SEC Form 8-K which

states:

> After furnishing a Form 8-K on Friday, April 22, 2011, Community Health Systems, Inc. (the "Company") obtained a copy of a joint motion filed Friday afternoon by the relator and the U.S. Department of Justice in the case styled *United States ex rel. and Reuille vs. Community Health Systems Professional Services Corporation and Lutheran Musculosskeletal Center, LLC d/b/a Lutheran Hospital*, filed in the United States District Court for the Northern District of Indiana, Fort Wayne Division. The government had previously declined to intervene in this case. The motion contains additional information about how the government intends to proceed with an investigation regarding "allegations of improper billing for inpatient care at other hospitals associated with Community Health Systems, Inc. . . . asserted in other *qui tam* complaints in other jurisdictions." The motion states that the Department of Justice has now "consolidated its investigations" of the Company and other related entities and that "the Civil Division of the Department of Justice, multiple United States Attorneys' offices, and the Office of Inspector General for the Department of Health and Human Services (HHS) are now closely coordinating their investigation of these overlapping allegations. The Attorney General of Texas has initiated an investigation; the United States intends to work cooperatively with Texas and any other States investigating these allegations." The motion also states that the Office of Audit Services for the Office of Investigations for HHS has been engaged to conduct a national audit of certain of the Company's Medicare claims. The government confirmed that it considers the allegations made in the complaint styled *Tenet Healthcare Corporation vs. Community Health Systems, Inc., et al.* filed in the United States District Court for the Northern District of Texas, Dallas Division on April 11, 2011 to be related to the allegations in the *qui tam* and to what the government is now describing as a consolidated investigation.
>
> Because *qui tam* suits are filed "under seal," no one but the relator and the government knows that the suit has been filed or what allegations are being made by the relator on behalf of the government. Initially, the government has sixty (60) days to make a determination about whether to intervene in a case and to act as the plaintiff or to decline to intervene and allow the relator to act as the plaintiff in the suit, but extensions of time are frequently granted to allow the government additional time to investigate the allegations. Even if, in the course of an investigation, the court partially unseals a complaint to allow the government and a defendant to work to a resolution of the complaint's allegations, the defendant is prohibited from revealing to anyone even that the partial unsealing has occurred. As the investigation proceeds, we may learn of additional *qui tam* suits filed against the Company or its affiliated hospitals or related entities, or that contact letters, document requests, or medical record requests we have received in the past from various governmental agencies are generated from *qui tam* cases filed under seal.

The motion filed Friday concludes by requesting a stay of the litigation in the *Reuille* case for 180 days. Our management company subsidiary, Community Health Systems Professional Services Corporation, the defendant in the *Reuille* case, consented to the request for the stay. As always, we will cooperate with the government in any investigation.

76.    By causing Community Health to come under the scrutiny of the DOJ, the Individual Defendants have exposed the Company to additional significant potential liability. Since 2007, the DOJ has announced at least four multi-million dollar settlements with hospitals over improper billing of observation patients as admissions, so a potential settlement between Community Health and the DOJ in the present case will come at a considerable cost to the Company.

77.    On May 18, 2011, the Company filed a Form 8-K disclosing, among other things, that it had received two additional subpoenas pursuant to the federal government's investigation into Community Health's inpatient-admissions and Medicare billing practices. In particular, the Company revealed that it received a subpoena from the SEC requesting documents related to its "emergency room admissions or observation practices at [its] hospitals," and also documents "relied upon by the Company in responding to the Tenet litigation, as well as other communications about the Tenet litigation." Also, the Company disclosed in its 8-K that it received a subpoena from the Houston office of the DHHS requesting a total of seventy-one patient medical records from its Shelbyville, Tennessee hospital to be rendered to the federal prosecutors handling the investigation into Community Health's Laredo hospital.

78.    The increased scrutiny surrounding the Company has also forced the Individual Defendants to announce over each of the last six quarters that the Company has reclassified patients as "observation" who had previously been billed as admitted for "one-day stays." Specifically, in quarterly earnings calls, defendant Cash announced:

- "Additionally, we did see a decline in one-day stays that affects inpatient volume and a corresponding increase in outpatient observation visits." Q4 2009 Earnings Call;

- "[R]eductions in one-day stays with a corresponding increase in outpatient observations of 50 basis points" contributed to a decline in same-store volume. Q1 2010 Earnings Call;

- A "reduction in one-day admissions with a corresponding increase in outpatient observations" and "movement of the one-day stays to observations." Q2 2010 Earnings Call;

- "Again, soft volumes continued throughout the third quarter. The following contributed to the decline . . . reductions in one-day stays with the corresponding increase in outpatient observations of 70 basis points." Q3 2010 Earnings Call; and

- For the fourth quarter of 2010, "reductions in one-day stays for corresponding increase in outpatient observations of 100 basis points" and, in 2010, total "movement of one-day stays to observation was 70 basis points." Q4 2010 Earnings Call.

79.     Finally, the Individual Defendants compromised Community Health's business and its reputation with its patients, business partners, regulators, and shareholders by accruing payments for services that were not reasonable and medically necessary to serve the patient in order to pad the Company's bottom line. In doing so, Community Health wholly disregarded the fundamental principles of medical care by failing to treat patients according to their individual clinical needs.

80.     In sum, Community Health may have improperly received as much as $377 million as a result of the Individual Defendants' systematic overbilling of Medicare through its inpatient-admissions practices. The DOJ may impose treble damages for false Medicare claims, and pursuant to the FCA, the Company stands to incur a penalty fine of up to $11,000 per claim for each of its 62,000 to 82,000 potentially improperly billed claims. In all, Community Health may face well over $1 billion in liabilities resulting from the Individual Defendants' actions during the 2006 to 2009 period. Worse, the foregoing $1 billion in potential damages and penalties does not even include the Company's potential liabilities to other payers who may have

been harmed by the Individual Defendants' admissions practices, including insurance companies, state Medicaid programs, employers, and patients. Lastly, Community Health may also incur additional investigatory costs and fines and penalties imposed by the DOJ and state regulatory agencies, as well as a myriad of private lawsuits that are likely to result.

81. The depth and magnitude of the Individual Defendants' misconduct have caused the Institutional Shareholder Services (ISS), a renown independent proxy advisor, to recommend against reelecting defendants Cash, Ely, and Fry in the most recent shareholder's annual meeting. In support of its recommendation to vote "against" reelecting defendants Cash, Ely, and Fry, ISS cited to "their failure to take appropriate action regarding the 'significant allegations' concerning Community's Medicare billing practices."

82. Despite the Individual Defendants' apparent role and responsibility in causing the Company to steer medically unnecessary, inpatient admissions at its hospitals, the Company has yet to institute any legal action against any of the Individual Defendants. By this action, plaintiff seeks redress for and vindication of Community Health's rights against its wayward fiduciaries.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

83. Plaintiff brings this action derivatively for the benefit of Community Health to obtain redress for the injuries suffered, and to be suffered, by Community Health as a result of the Individual Defendants' breaches of fiduciary duty, corporate waste, and unjust enrichment. Community Health is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

84. Plaintiff was a shareholder of Community Health at the time of the continuing wrong complained of. The continuing wrong included causing the Company to engage in illegal business practices by overbilling Medicare, Medicaid, and other payers, and the issuance of

improper statements regarding the Company's financial results and business operations. Once plaintiff became a shareholder, it has continuously been a shareholder.

85.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

86.    The current Board of the Company consists of the following eight individuals: defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson.

87.    As particularized above, the Individual Defendants breached their fiduciary duty of loyalty (and candor and good faith) and engaged in unlawful conduct. Accordingly, plaintiff has not made any demand on the Board because such a demand would be a futile and useless act, particularly for the reasons stated below.

## Demand Is Excused Because the Board's Conduct Is Not a Valid Exercise of Business Judgment

88.    Defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson's challenged misconduct at the heart of this case constitutes the direct facilitation of improper inpatient-admission practices, and violations of federal and state laws and regulations that threaten the Company's very survival. As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy and model based on deliberate and widespread improper activities, while disregarding their duties to their patients and shareholders. Defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson's misconduct was especially egregious because it was targeted at defrauding the federal and state government, and the taxpayers, in order to derive a greater personal profit for themselves. These defendants' wrongdoings have exposed the Company to significant civil liability and draconian penalties pursuant to the FCA. Causing the Company to engage in improper and illegal conduct that threatens its survival is not a protected business decision and

such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

## Demand Is Excused as to the Board Because They Face a Substantial Likelihood of Liability

89.     Demand is futile as to defendant Smith because as the CEO, Chairman, and President, he knowingly or recklessly implemented and maintained an unsustainable inpatient-admissions policy solely focused on maximizing the amount of reimbursement it could receive from federal, state, and other payer sources notwithstanding the legal implications. As a result, the Company is mired in a litany of investigations and lawsuits, and has been charged with violating certain Medicare and Medicaid regulations which threaten to cutoff a significant source of its revenue – Medicare and Medicaid funding. Further, defendant Smith knowingly or recklessly made improper statements in the Company's public filings concerning its revenue derived from Medicare and Medicaid, and exploited the resulting boost in the price of Community Health's stock by selling his personally-owned shares of the Company's stock. As the CEO, Chairman, and President of the Company, defendant Smith had the utmost duty and responsibility to ensure that the Company was in compliance with all federal and state laws and regulations. Instead, in a direct breach and dereliction of his fiduciary duties, defendant Smith knowingly or recklessly engaged in misconduct that has exposed the Company to billions of dollars in liability and sanctions. Because defendant Smith faces a substantial likelihood of liability for breaching his fiduciary duty of loyalty, demand upon him is futile.

90.     Defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson intentionally, knowingly, or recklessly, caused, authorized, and or allowed Community Health to engage in improper inpatient-admissions practices which it knew was unsustainable because it was in direct contravention of federal and state laws and regulations. Their failure is especially egregious given their knowledge that a violation of the Medicare or Medicaid regulations could

35

render the Company ineligible to further participate in those programs, and that Medicare and Medicaid revenue was critical to the Company's operations. Further, defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson also made improper statements in the Company's public filings that vastly overstated its revenue figures derived from Medicare and Medicaid reimbursements. Defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson's misconduct have exposed the Company to a billion dollars' worth of liability, and placed Community Health at the mercy of federal regulators who will likely impose harsh penalties and sanctions against it to deter similar conduct in the industry. Because defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson face a substantial likelihood of liability for breaching their fiduciary duties of loyalty, demand upon them is futile.

91.     Defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson as members of the Board, were and are subject to the Code. The Code went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.    The Code required defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson to conduct their business affairs "with the highest ethical and legal standards." Further, the Code forbid defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson from engaging "in any intentional deception or misrepresentation intended to influence any entitlement or payment under any federal healthcare benefit program" and directed them to "adhere to all official coding billing guidelines, rules, regulations, statutes, and laws." In particular, the Policy explicitly prohibited defendants from violating the FCA. This they did not do. As detailed herein, defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson violated the Code by causing or allowing the Company to engage in improper and illicit inpatient-admission practices that were in violation of federal and state regulations.    Consequently, these defendants also knew the Company received unwarranted reimbursements from Medicare, Medicaid, and other payer

sources as a result of its improper admissions criteria, and as a result the Company's reported earnings results were vastly overstated. Because defendants Smith, Cash, Clerico, Ely, Fry, Jennings, North, and Watson violated the Code by engaging in illegal, dishonest, and unethical conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, thereby demand upon them is futile.

92.     Defendants Clerico, Ely, and Fry were members of the Audit Committee during the misconduct detailed herein. As members of the Audit Committee, these Audit Committee Defendants had additional and heightened responsibility under its charter tooversee"the integrity of the Company's financial statements" and its "compliance with its legal and regulatory requirements." Thus, the Audit Committee Defendants violated the Audit Committee Charter by knowingly or recklesslyallowing the Company to engage in improper inpatient-admissions practices in violation of federal and state regulations, and by making and approving improper statements in its public filings. Accordingly, the Audit Committee Defendants breached their fiduciary duties of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Clerico, Ely, and Fry face a substantial likelihood of liability for their breach of fiduciary duties, so any demand upon them is futile.

93.     Defendants Smith and Cash face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith by selling their personally-held shares of the Company's stock for approximately$33.8 million in profits while Community Health's stock price was artificially inflated. The Company's stock price was inflated due to improper statements made and approved by the Individual Defendants that overstated the Company's revenues derived from Medicare and Medicaid reimbursements. As members of the Board, these defendants were privy to adverse, non-public information concerning the Company's improper and unsustainable inpatient-admissions practices, and knew that the Company's stock was

artificially inflated due to their improper statement regarding revenues derived from Medicare and Medicaid sources. As detailed herein, defendants Smith and Cash exploited this information for their own personal gain and effectively profited from their own misconduct. Accordingly, defendants Smith and Cash face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith, and demand upon them is futile.

94. As is detailed below, defendants Smith and Cash each possess individual conflicts of interest that hopelessly prevent an independent and disinterested evaluation of any demand against certain of their fellow defendants:

(a) Defendants Smith and Cash share a personal relationship that dates back to 1973 when they held various positions with Humana, a Fortune 100 Company that markets and administers health insurance. At Humana, defendants Cash and Smith both served in executive positions until their joint departure in 1996, when they decided to venture together at Community Health. Since 1997, defendants Smith and Cash have worked side-by-side at Community Health in executive and directorial roles, managing and overseeing the daily operations of the Company. In fact, it is their joint mismanagement of Community Health that has decimated the Company and exposed it to several lawsuits, staggering penalties, and severe sanctions. Hence, their deeply-rooted partnership that spans over thirty-eight years and their joint involvement in the misconduct detailed herein raises a reasonable doubt that they can independently and in a disinterested fashion consider instituting a legal action against the other. Demand is futile as to defendants Smith and Cash.

(b) Defendant Cash is beholden to the Board for the extensive privileges and perquisites afforded him and his immediate family members since as far back as 2000. Since at least 2000, the Company has employed defendant Cash's son, Brad Cash ("B. Cash"), in various well-paying positions in its hospitals, including as a financial analyst, assistant CFO, CFO, and a

divisional financial executive. In total, the Company paid B. Cash a $2.31 million in compensation for his services, as detailed in the table below:

| Year | Position | Total Compensation |
|------|----------|--------------------|
| 2001 | Group Financial Analyst/ CFO of 1 Hospital | $90,457 |
| 2002 | CFO of 1 Hospital | $84,929 |
| 2003 | CFO of 2 Hospitals | $142,801 |
| 2004 | CFO of 1 Hospital | $140,901 |
| 2005 | CFO of 1 Hospital | $182,368 |
| 2006 | CFO of 2 Hospitals | $219,822 |
| 2007 | CFO of 1 Hospital/ Divisional Financial Executive | $196,257 |
| 2008 | Divisional Financial Executive | $295,400 |
| 2009 | Divisional Financial Executive | $370,440 |
| 2010 | Divisional Financial Executive | $587,050 |
| Total | | $2,310,425 |

Further, the Company has made significant investments in Greenwood Marketing and Management ("GMM"), a business owned and operated by defendant Cash's wife, Anita Greenwood Cash ("A. Cash"). The Company paid GMM approximately $239,000, $207,000, $196,000, $114,000, in 2000, 2001, 2002, and 2003, respectively, for unspecified marketing services, postage, magazines, handbooks, sales brochures, training manuals, and membership services. Finally, in 2001, the Board paid Cross Country, Inc., a company for which defendant Cash serves as a director, $61,437 for unidentified healthcare staffing services. As the foregoing demonstrates, the Board extended defendant Cash and his immediate family members every privilege and lucrative perquisites that it has not afforded other executive members. As such, defendant Cash is indebted to the Board, and hopelessly conflicted and unable to render independent and disinterested judgment upon a demand to institute litigation against them. Hence, demand is futile as to defendant Cash.

95.     The acts complained of constitute violations of the fiduciary duties owed by Community Health's officers and directors and are incapable of ratification.

96.     Community Health has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Individual Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for Community Health any part of the damages Community Health suffered and will suffer thereby. The Board's stubborn failure to investigate, correct, and commence legal action against those responsible for the misconduct alleged herein in the face of heavy media and investor scrutiny on the matter, demonstrates that the Board is hopelessly incapable of independently addressing any legitimate demand.

97.     If Community Health's current and past officers and directors are protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Community Health. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Community Health against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause Community Health to sue themselves or certain of the officers of Community Health, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance, then the current directors will not cause Community

Health to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

98.     Plaintiff has not made any demand on the other shareholders of the Company to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     the Company is a publicly held company with tens of millions of shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against All Individual Defendants for Breach of Fiduciary Duties

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    The Individual Defendants owed and owe Community Health and its shareholders fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Community Health the highest obligation of good faith, fair dealing, loyalty, and due care, and diligence in the management of the Company.

101.    The Individual Defendants have each violated and breached their fiduciary duties, including their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision by causing or allowing the Company to engage in improper inpatient-admissions practices in order to maximize reimbursement payments from Medicare and other payer sources. The Individual Defendants further breached their fiduciary duties by making, or allowing the

Company to make, improper statements in their public filings concerning their Medicare and Medicaid revenues they knew were unwarranted and improperly obtained.

102. Defendants Smith, Cash, and Buford breached their duty of loyalty by selling over $36.5 million of their personally held Community Health stock on the basis of their knowledge of the improper information described above before that information was revealed to the Company's shareholders. The information described above was proprietary, non-public information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which these defendants used for their own benefit when they sold the Company's stock.

103. Further, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Community Health in a manner consistent with the operations of a publicly held corporation and under the applicable law. They are each responsible for the gross and reckless management of Community Health and ignored their fiduciary responsibilities by causing the Company to engage in the unlawful conduct described herein

104. As a direct and proximate result of the Individual Defendants' failures to perform their fiduciary obligations, Community Health has sustained significant damages.

105. Plaintiff, on behalf of Community Health, has no adequate remedy at law.

## COUNT II

### Against All Individual Defendants for Waste of Corporate Assets

106. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107. As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its shareholders, the Individual Defendants caused Community

Health to incur, and Community Health will continue to incur, significant legal liability and/or legal costs to defend itself as a result of the Individual Defendants' unlawful actions.

108.     As a result of this waste of corporate assets, the Individual Defendants are liable to the Company.

109.     Plaintiff, on behalf of Community Health, has no adequate remedy at law.

## COUNT III

### Against All Individual Defendants for Unjust Enrichment

110.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.     As a result of the misconduct particularized herein, the Individual Defendants have been unjustly enriched at the expense of and to the detriment of Community Health, in the form of unjustified salaries, benefits, bonuses, and other emoluments of office.

112.     Defendants Smith, Cash, and Buford sold Community Health stock while in possession of material, adverse non-public information that artificially inflated the price of the Company's stock.    As a result, defendants Smith, Cash, and Buford profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

113.     Plaintiff, as a shareholder and representative of Community Health, seeks restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other improper payments obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

114.     Plaintiff, on behalf of Community Health, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and aiding and abetting breaches of fiduciary duties;

B. Directing Community Health to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies;

(i) a proposal to strengthen the Company's controls over Medicare reimbursement and billing;

(ii) a proposal to strengthen the Company's oversight of its admission procedures;

(iii) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iv) a provision to permit the shareholders of the Company to nominate at least three candidates for election to the Board; and

(v) a proposal to strengthen the Board's supervision of the accuracy and authenticity of the Company's financial records and bank statements;

C.    Awarding to Community Health restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

E.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 23, 2011

_WADE B. COWAN_
DAVIES, HUMPHREYS, HORTON & REESE
150 Second Ave. North, Suite 225
Nashville, TN 37201
Telephone: (615) 256-8125
Facsimile: (615) 242-7853
wcowan@dhhrplc.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
ASHLEY R. PALMER
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

SUGARMAN & SUSSKIND
HOWARD SUSSKIND
PEDRO A. HERRERA
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
Telephone: (305) 529-2801
Facsimile: (305) 447-8115

Attorneys for Plaintiff

## VERIFICATION

I, Roger Morgan, hereby declare as follows:

I, Roger Morgan, on behalf of the Plumbers & Pipefitters Local Union 630 Pension-Annuity Trust Fund, have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Corporate Waste, and Unjust Enrichment (the "Complaint") and know the contents thereof. I am informed and believe the matters in the Complaint are true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 5/19/2011

ROGER MORGAN
CHAIRMAN