UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| In re COMMUNITY HEALTH SYSTEMS, INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master Docket No. 3:11-cv-00489<br><br>(Consolidated with No. 3:11-cv-00598 and No. 3:11-cv-00952)<br><br>Judge Kevin H. Sharp<br><br>Magistrate Judge Joe B. Brown |

SECOND AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF FIDUCIARY DUTY

DEMAND FOR JURY TRIAL

1.      This is a shareholder derivative action brought on behalf of Community Health Systems, Inc. ("Community Health" or the "Company") alleging breach of fiduciary duty from at least 2006 to the present (the "Relevant Period"), which has damaged Community Health to the tune of hundreds of millions of dollars.  These ongoing violations continue to harm the Company.  The defendants are executive officers: Wayne T. Smith and W. Larry Cash and directors: John A. Fry, William Norris Jennings, H. Mitchell Watson, Jr., Julia B. North and John A. Clerico (collectively, "defendants").

## OVERVIEW OF THE ACTION

2.      Community Health operates approximately 134 general acute care hospitals in 29 states with approximately 19,800 licensed beds.  Community Health also provides hospital management, consulting, and advisory services to more than 150 independent community hospitals and health systems in the United States.

3.      Defendants here, Community Health's executives and directors, are professionals with extensive experience working in the United States healthcare industry.  Community Health receives approximately 37.8% of its revenues from the Medicare system administered by the federal government and various states' Medicaid systems.  Thus, defendants are intimately familiar with Medicare's requirements and regulations regarding when a company can receive reimbursement for inpatient care.

4.      For example, under federal law, Medicare reimburses hospitals for treatment that is "reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. §1395y(a)(1)(A).  Additionally, Medicare disallows payment for services that were not "medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary."  Medicare Program Integrity Manual, Chapter 6, §6.5.2 (2009).  Thus, inpatient care is only appropriate "if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care was provided in a less intensive setting."  *Id.*  Medicare guidelines also require that hospitals

maintain a set of admissions criteria for determining whether a patient's condition is serious enough to warrant inpatient treatment.

5.     On April 11, 2011, shareholders were surprised to find out that defendants breached their fiduciary duties of loyalty and good faith by causing Community Health to ignore Medicare and Medicaid regulations by developing an admissions criteria that systematically steers patients into medically unnecessary inpatient admissions when those patients should be safely and effectively treated as outpatients in observation status.  Defendants' breaches allowed Community Health to receive approximately $280 million to $377 million of ill-gotten revenues between 2006 and 2009, by treating Medicare patients on an admitted inpatient basis who should have been treated in observation.  Defendants caused Community Health to implement this policy in order to artificially inflate the Company's stock price.

6.     These improper revenues, however, pale in comparison to the fines and liability the Company now faces.  In fact, by some estimates, defendants' fiduciary failures may have subjected Community Health to liability and damages of well over $1 billion.  Defendants' actions have also subjected the Company to complex and expensive-to-defend securities class action lawsuits as well as a lawsuit by its direct competitor, Tenet Healthcare Corporation ("Tenet").  Additionally, Community Health is now the subject of multiple government investigations, and the federal government has already intervened in one *qui tam* action regarding defendants' wrongdoing.

7.     Defendants also made, or caused the Company to make, materially false and misleading statements overstating Community Health's revenues derived from Medicare and Medicaid reimbursements.  These false statements deceived the investing public and artificially inflated the Company's stock because they omitted the fact that defendants caused the Company to admit patients for inpatient treatment in violation of Medicare and Medicaid regulations.  In turn, defendants Smith and Cash their knowledge of the Company's true financial results and inflated

stock price for their own benefit by selling over ***$33.8 million worth of their personally held stock***, while in possession of this material, adverse non-public information.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. §1332(a)(2).  This is because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this case involves alleged violations of federal law by the defendants, including 42 U.S.C. §1395y(a)(1)(A) and the Federal False Claims Act ("FCA") 31 U.S.C. §3729.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Community Health maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Community Health occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

12.    (a)    Plaintiffs Steve Irwin, Roger D. Morgan, Bill Pickrell, Michael Senecal, Susan Stokes and Mark F. Woodard are the Trustees of the Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund ("Plumbers"), and pursue this action in their capacity as the Trustees of Plumbers. Plumbers is a shareholder of Community Health and has continuously held Community Health stock since at least 2010. Plaintiffs Steve Irwin, Roger D. Morgan, Bill Pickrell, Michael Senecal, Susan Stokes and Mark F. Woodard are each citizens of the State of Florida. Plaintiffs will fairly and adequately represent Community Health's interests in this action.

(b)    Plaintiffs Lee Bruner, Joseph Gilliam, Ronald Inman, Roger LaDuke, Brian Moore, Mark Peterson, Paul Schick and Gary Sova are the Trustees of the Roofers Local No. 149 Pension Fund ("Roofers"), and pursue this action in their capacity as the Trustees of Roofers. Roofers is a shareholder of Community Health and has continuously held Community Health stock since at least 2006. Plaintiffs Lee Bruner, Joseph Gilliam, Ronald Inman, Roger LaDuke, Brian Moore, Mark Peterson, Paul Schick and Gary Sova are each citizens of the State of Michigan. Plaintiffs will fairly and adequately represent Community Health's interests in this action.

13.    Nominal party Community Health is a Delaware corporation with its executive offices located at 4000 Meridian Boulevard, Franklin, Tennessee 37067.  Community Health is a leading operator of general acute care hospitals in non-urban and mid-size markets throughout the country.  Through its subsidiaries, Community Health owns, leases or operates approximately 134 hospitals in 29 states with an aggregate of approximately 19,800 licensed beds.  Nominal party Community Health is a citizen of the States of Delaware and Tennessee.

14.    Defendant Smith has been a Community Health director since 1997 and the Chairman of Community Health's Board of Directors ("Board") since 2001.  He has also been Community Health's President and Chief Executive Officer ("CEO") since 1997.  Defendant Smith is also President and CEO of Community Health's wholly owned subsidiary, Community Health Systems

Professional Services Corporation ("CHSPSC"), and an officer and/or director of certain of Community Health's hospitals, including: (i) Roswell Hospital Corporation; (ii) San Miguel Hospital Corporation; and (iii) Deming Clinic Corporation. In addition to his involvement within Community Health and its subsidiaries and hospitals, Smith has been an executive and/or director of several public companies operating in the healthcare industry, including Humana, Inc. ("Humana"), the Nashville Healthcare Council and the Federation of American Hospitals. Smith has also served as a director of Praxair, Inc., a company that provided certain services to the healthcare industry. As an experienced industry professional, Smith knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly, recklessly, or with gross negligence caused the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Smith also knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings with the Securities and Exchange Commission ("SEC") concerning its financial results and business prospects that failed to disclose the Company's improper business practices. While in possession of material, non-public information concerning Community Health's true business operations, defendant Smith sold 500,000 shares of his Community Health stock for $16,770,301.45 in proceeds. Community Health paid defendant Smith the following compensation as an executive:

| Defendant | Year | Salary | Restricted Stock Awards | Option Awards | All Other Comp | Total |
|---|---|---|---|---|---|---|
| Smith | 2010 | $1,365,000 | $6,780,000 | $418,500 | $12,397,069 | $20,960,569 |
| | 2009 | $1,300,000 | $4,545,000 | $303,000 | $11,687,990 | $17,835,990 |
| | 2008 | $1,080,000 | $3,228,000 | $1,510,000 | $4,857,267 | $10,675,267 |
| | 2007 | $1,035,000 | $12,919,300 | $6,556,000 | $3,339,801 | $23,850,101 |

Defendant Smith is a citizen of the State of Kentucky.

1182636_2

15.    Defendant Cash has been a Community Health director since 2001.  He has also been Community Health's Chief Financial Officer ("CFO") and Executive Vice President since 1997. Defendant Cash is also CFO of Community Health's wholly owned subsidiary, CHSPSC, and an officer and/or director of certain of Community Health's hospitals, including: (i)  Roswell Hospital Corporation; (ii)  Roswell Clinic Corporation; (iii)  Roswell Community Hospital Investment Corporation; (iv) Deming Hospital Corporation; (v) Deming Clinic Corporation; (vi) Deming Home Care Services, LLC; (vii) San Miguel Hospital Corporation; and (viii) San Miguel Clinic Corporation.  In addition to his involvement within Community Health and its subsidiaries and hospitals, Cash has been an executive and/or director of several public companies operating in the healthcare industry, including Columbia/HCA Healthcare Corporation, Humana and Cross Country Healthcare, Inc. ("Cross Country").  As an experienced industry professional, Cash knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws.  Nonetheless, he knowingly, recklessly, or with gross negligence caused the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources.  Defendant Cash also knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.  While in possession of material, non-public information concerning Community Health's true business operations, defendant Cash sold 480,000 shares of his Community Health stock for $17,069,760.00 in proceeds.  Community Health paid defendant Cash the following compensation as an executive:

| Defendant | Year | Salary | Restricted Stock Awards | Option Awards | All Other Comp | Total |
|-----------|------|--------|-------------------------|---------------|----------------|-------|
| Cash | 2010 | $735,000 | $2,712,000 | $250,500 | $4,390,623 | $8,088,123 |
| | 2009 | $700,000 | $1,818,000 | $121,200 | $4,335,003 | $6,974,203 |
| | 2008 | $664,000 | $1,936,800 | $453,000 | $2,088,363 | $5,142,163 |

| | 2007 | $644,000 | $6,273,600 | $2,829,600 | $1,322,422 | $11,079,642 |

Defendant Cash is a citizen of the State of Tennessee.

16.     Defendant Clerico has been a Community Health director since 2003.  He is also Chairman of Community Health's Audit and Compliance Committee and a member of its Compensation Committee.  In addition to Community Health, Clerico has been an executive and/or director of several public companies, including ChartMark Investments, Inc., Global Industries, Ltd., Praxair, Inc., Union Carbide Corporation and Educational Development Corporation.  As an experienced business professional, Clerico knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources.  Defendant Clerico knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.  Community Health paid defendant Clerico the following compensation as a director:

| Defendant | Year | Fees Paid in Cash | Restricted Stock Awards | Total |
|-----------|------|-------------------|-------------------------|-------|
| Clerico   | 2010 | $95,000 | $140,007 | $235,007 |
|           | 2009 | $85,000 | $130,005 | $215,005 |
|           | 2008 | $73,500 | $323,872 | $397,372 |
|           | 2007 | $77,500 | $169,759 | $247,259 |

Defendant Clerico is a citizen of the State of Oklahoma.

17.     Defendant Fry has been a Community Health director since 2004.  He is also a member of Community Health's Audit and Compliance and Governance and Nominating Committees.  In addition to Community Health, Fry has extensive management experience, including serving as the President of Drexel University, President of Franklin & Marshall College, Executive Vice President and Chief Operations Officer of the University of Pennsylvania, and a

member of the executive committee of the University of Pennsylvania Health System. As an experienced professional, Fry knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Fry also knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices. Community Health paid defendant Fry the following compensation as a director:

| Defendant | Year | Fees Paid in Cash | Restricted Stock Awards | Total |
|-----------|------|-------------------|-------------------------|-------|
| Fry | 2010 | $80,000 | $140,007 | $220,007 |
| | 2009 | $70,000 | $130,005 | $200,005 |
| | 2008 | $58,500 | $323,872 | $382,372 |
| | 2007 | $62,000 | $169,759 | $231,759 |

Defendant Fry is a citizen of the State of Pennsylvania.

18. Defendant Jennings has been a Community Health director since 2008. He is also a member of Community Health's Governance and Nominating Committee. In addition to Community Health, Jennings has extensive healthcare experience, including serving as a practicing family medicine physician employed by The Physician Group. As an experienced industry professional, Jennings knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws. Nonetheless, he knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources. Defendant Jennings also knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial

results and business prospects that failed to disclose the Company's improper business practices.

Community Health paid defendant Jennings the following compensation as a director:

| Defendant | Year | Fees Paid in Cash | Restricted Stock Awards | Total |
|---|---|---|---|---|
| Jennings | 2010 | $80,000 | $140,007 | $220,007 |
| | 2009 | $70,000 | $130,005 | $200,005 |
| | 2008 | $36,500 | $45,321 | $81,821 |

Defendant Jennings is a citizen of the State of Kentucky.

19.    Defendant North has been a Community Health director since 2004.  She is also Chairman of Community Health's Governance and Nominating Committee and a member of its Compensation Committee.  In addition to Community Health, North has been an executive and/or director of several public companies, including BellSouth Telecommunications, Inc., VSI Enterprises, Inc., Acuity Brands, Inc., NETLOS, Inc., Simtrol, Inc., Winn-Dixie, Inc. and MAPICS, Inc.  As an experienced business professional, North knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws.  Nonetheless, she knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources.  Defendant North also knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.  Community Health paid defendant North the following compensation as a director:

| Defendant | Year | Fees Paid in Cash | Restricted Stock Awards | Total |
|---|---|---|---|---|
| North | 2010 | $90,000 | $140,007 | $230,007 |
| | 2009 | $80,000 | $130,005 | $210,005 |
| | 2008 | $68,125 | $323,872 | $391,997 |
| | 2007 | $60,000 | $169,759 | $229,759 |

Defendant North is a citizen of the State of Georgia.

20.     Defendant Watson has been a Community Health director since 2004.  He is also Chairman of Community Health's Compensation Committee.  In addition to Community Health, Watson has been an executive and/or director of several public companies, including International Business Machines Corporation (IBM), ROLM Company, Praxair, Inc., Roadway, Inc. and MAPICS, Inc.  As an experienced business professional, Watson knew or should have known that Community Health was required to comply with Medicare reimbursement standards and other federal and state laws.  Nonetheless, he knowingly or recklessly caused or allowed the Company to engage in improper inpatient-admissions practices at Community Health hospitals for the purpose of obtaining higher and unwarranted payments from Medicare and other payer sources.  Defendant Watson also knowingly or recklessly made improper statements in the Company's public filings with the SEC concerning its financial results and business prospects that failed to disclose the Company's improper business practices.  Community Health paid defendant Watson the following compensation as a director:

| Defendant | Year | Fees Paid in Cash | Restricted Stock Awards | Total |
|-----------|------|-------------------|-------------------------|-------|
| Watson | 2010 | $90,000 | $140,007 | $230,007 |
| | 2009 | $80,000 | $130,005 | $210,005 |
| | 2008 | $69,500 | $323,872 | $393,372 |
| | 2007 | $76,000 | $169,759 | $245,759 |

Defendant Watson is a citizen of the State of North Carolina.

## AIDING AND ABETTING

21.     In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.  In addition to the wrongful conduct particularized herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

22. Each of the defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his, her, or its overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS' DUTIES

23. It is now well established that the directors of publicly traded corporations owe a fiduciary duty to the corporation they are elected to serve. This fiduciary duty, in fact, includes two separate fiduciary duties: a duty of care and a duty of loyalty. *Stone v. Ritter*, 911 A.2d 362 (Del. 2006). Each officer and director of Community Health owed Community Health and its shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Community Health's officers and directors complained of herein involves a knowing, intentional, and culpable violation of their obligations as fiduciaries of Community Health and the absence of good faith on their part for their duties to the Company and its shareholders.

24. Defendants knew that, as Community Health's directors and top officers, it was their obligation to cause Community Health to comply with the law and properly admit patients in compliance with Medicare and Medicaid regulations, to accurately bill for Medicare and Medicaid reimbursements, and not mislead the investing public by reporting improper revenue. Indeed, a number of Community Health's directors were nominated for election to the Community Health Board specifically because of their extensive industry and business management experience. For example, as Community Health states in its 2010 Proxy Statement, dated April 7, 2011:

- Defendant Smith "is one of the most tenured executives in the healthcare industry, with decades of experience in both the hospital sector and the managed care sector";

- Defendant Cash has "prior managed care experience [and] brings that perspective to [the] Board's deliberations and evaluation of its business and strategy";

- Defendant Jennings "brings practitioner insight to quality measures and reporting, electronic health record implementation, and federal government regulation of practitioner-hospital relationships"; and

- Defendant Watson "has extensive audit committee experience with a variety of different types of companies and he imparts those concepts to the oversight of the Company's financial management and audit functions."

25.    The Company also had in place a Code of Conduct (the "Code"). The Code claims that the Company is dedicated to "compliance with all federal, state, and local laws, rules, and regulations, including . . . billing." Pursuant to the Code, officers and directors are required to conduct their business affairs "with the highest ethical and legal standards." As for billing, the Code states that "colleagues shall not engage in any intentional deception or misrepresentation intended to influence any entitlement or payment under any federal healthcare benefit program" and that "all individuals responsible for coding and billing for services will adhere to all official coding billing guidelines, rules, regulations, statutes, and laws." Further, failure to adhere to the Code is grounds for disciplinary action, including termination.

26.    The Company's Compliance Policy on Preventing, Deleting and Reporting Fraud, Waste, and Abuse (the "Policy") contains an entire section devoted to FCA violations. This section provides a list of actions that would run afoul of the FCA and the Policy, including: (i) knowingly filing "a false or fraudulent claim for payment to Medicare, Medicaid or any other federally funded health care program"; (ii) knowingly using "a false record or statement to obtain payment on a false or fraudulent claim from Medicare, Medicaid or any other federally funded health care program"; (iii) conspiring "to defraud Medicare, Medicaid or any other federally funded health care program by attempting to have a false or fraudulent claim paid"; or (iv) knowingly using "a false record or statement to conceal, avoid, or decrease an obligation to pay money or transmit property to the Federal Government." In particular, the Policy specifically states that a "false claim may include

overbilling for a product or service." Finally, the Policy sets forth the consequences of violating the FCA, including "[f]ines between $5,500 and $11,000 plus three times the amount of damages sustained by the government for each false claim."

27. Accordingly, defendants, at all relevant times, knew: (i) the risks associated with establishing admissions criteria that improperly steered patients to costly inpatient admissions at Community Health hospitals in order to collect unwarranted payments from Medicare and other sources; and (ii) that Community Health could incur significant penalties and liability arising from federal and state investigations and proceedings, as well as private lawsuits and loss of goodwill, if they did not comply with applicable rules and regulations, other legal obligations, and widely accepted standards of clinical care.

**Audit and Compliance Committee Duties**

28. In addition to these duties, under Community Health's Board's Audit and Compliance Committee Charter (the "Audit Committee Charter") adopted and in effect since at least 2001, defendants Clerico and Fry, otherwise referred to as the "Audit Committee Defendants," owed specific duties to the Company. According to the Audit Committee Charter, the Audit Committee Defendants were responsible for assisting the Board in its oversight of "the integrity of the Company's financial statements" and its "compliance with its legal and regulatory requirements." The Audit Committee Defendants also had specific duties to "discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies prior to their release." Finally, the Audit Committee Defendants were required to advise the Board on the policies and procedures of the Corporate Compliance program.

## COMMUNITY HEALTH'S MANAGEMENT OVER ITS HOSPITALS

29. Community Health is a holding company that, through majority voting control, controls all of its direct and indirect subsidiaries. CHSPSC is a wholly owned subsidiary of

Community Health that handles all the management services for Community Health hospitals. Executive officers of Community Health hold identical positions at CHSPSC.

30.     CHSPSC has five Divisions, each of which manages Community Health hospitals located within a certain geographical region. Each of the five Divisions within CHSPSC has its own Operations Leadership, comprised of five Vice Presidents that report to their respective Senior Division Operations Leadership Presidents. The Division Presidents hold that position at both the Company and CHSPSC.

31.     Each Division's Operations Leadership "provide[s] hospital CEOs with guidance, support and expertise in almost every area of hospital management. Conversely, hospital CEOs can give direct input to the corporate office through their Division's leadership." As is made clear through the Company's disclosures, the Division Presidents are intimately familiar with "almost every area of hospital management" and maintain an open line of communication with the CEO of each hospital within their respective divisions.

32.     In addition to having an open line of communication with the CEO of each hospital, the Division Presidents also have an open line of communication with defendant Cash and the Board. In fact, the Division Presidents provide regular updates to the Board on their respective Divisions. Community Health also held weekly conference calls with the Division Presidents to review emergency department conversion percentages (the percentage of emergency room patients that were admitted to the hospital).

33.     According to the Company's Form 10-K, filed with the SEC on February 25, 2011, each of Community Health's hospitals has a management team that is supported by the Company's "centralized operational, reimbursement, regulatory and compliance expertise, as well as by our senior management team, which has an average of over 25 years of experience in the healthcare industry." Community Health further disclosed that:

Our standardization and centralization initiatives encompass nearly every aspect of our business, [including] developing standard policies and procedures with respect to patient accounting and physician practice management . . . . Our standardization and centralization initiatives are a key element in improving our operating results.

\*       \*       \*

Our case and resource management program is a company-devised program developed with the goal of improving clinical care and cost containment. The program focuses on:

- appropriately treating patients along the care continuum;

- reducing inefficiently applied processes, procedures and resources;

- developing and implementing standards for operational best practices; and

- using on-site clinical facilitators to train and educate care practitioners on identified best practices.

34.     Further, defendant Smith, who serves as Chairman, President, and CEO of Community Health, also serves as President and CEO of CHSPSC, and serves as an officer and/or director of certain of Community Health's hospitals: (i) including Roswell Hospital Corporation; (ii) San Miguel Hospital Corporation; and (iii) Deming Clinic Corporation. Similarly, defendant Cash, who serves as Vice President and CFO of Community Health, also serves as Vice President and CFO of CHSPSC, and serves as an officer and/or director of certain of Community Health's hospitals, including: (i) Roswell Hospital Corporation; (ii) Roswell Clinic Corporation; (iii) Roswell Community Hospital Investment Corporation; (iv) Deming Hospital Corporation; (v) Deming Clinic Corporation; (vi) Deming Home Care Services, LLC; (vii) San Miguel Hospital Corporation; and (viii) San Miguel Clinic Corporation.

35.     Through this management structure, the Individual Defendants were able to ensure that Community Health hospitals implemented the Company's standardized policies and procedures, including the Company's improper admissions criteria that were not in accordance with industry standards and Medicare and Medicaid regulations.

1182636_2

## INDUSTRY STANDARD FOR TREATING PATIENTS ACCORDING TO NEED

36.     When a patient enters a hospital, physicians generally have three options when it comes to treating the patient.  First, for the most serious cases, a patient may be admitted to the hospital so that the patient may receive care that is expected to last for 24 hours or more.  Second, when a patient's medical status does not necessarily require inpatient treatment, but additional monitoring and assessment is required to appropriately care for the patient, a patient is placed into outpatient observation status for care and monitoring that is expected to last less than 24 hours, but which may take as long as 48 hours if the physician is unable to make a determination within a 24-hour period.  Observation patients are regularly assessed by hospital staff during the course of their stay – often receiving identical care or treatment as patients who are admitted to the hospital – until the physician determines that there is no medical need for the patient to remain in the hospital or that the patient should be admitted.  Third, for patients with relatively minor medical needs, physicians and nurses may provide treatment on an outpatient basis and discharge the patient without that patient being admitted into the hospital or placed into observation.

37.     The use of observation status to treat patients is widely recognized as an essential tool for improving clinical decision making and providing cost effective medical care.  Pursuant to the Medicare Benefit Policy Manual:

> Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital. Observation services are commonly ordered for patients who present to the emergency department and who then require a significant period of treatment or monitoring in order to make a decision concerning their admission or discharge.

Medicare Benefit Policy Manual, Chapter 6, §20.6A (2009).

38.     Generally, observation care is appropriate for patients whose medical conditions (such as chest pain or abdominal pain) require diagnostic evaluation because: (i) the balance between the probability of the disease and the dangerousness of the disease warrants further evaluation;

(ii) the patient presents a condition that cannot be readily diagnosed without additional testing; or (iii) the physician simply needs more time to evaluate the patient's symptoms to determine the most appropriate medical treatment.

39.     Observation care is also appropriate for patients who require short-term treatment of emergent conditions.  These are patients with conditions for which there is a high probability of therapeutic success with a limited amount of services, such as patients with asthma, dehydration or an infection.  In addition, patients who require therapeutic procedures that do not necessitate inpatient admissions, but who nonetheless require some period of hospital care, are best treated in observation.  For certain procedures performed for therapeutic (such as transfusions) or diagnostic (such as angiograms) reasons, observation treatment can expedite the performance of these procedures.

40.     Since many patients' conditions improve through quick, aggressive treatment, and because testing may eliminate serious risks and allow patients to return home, the vast majority of observation patients are sent home without ever being admitted to the hospital.  In addition, with shorter stays and typically less testing and treatments for observation patients as compared to admitted patients, observation care can be very cost-effective for payers.

41.     The decision of whether to treat a patient on an inpatient or outpatient observation basis has significant financial ramifications for the hospital.  Indeed, according to the independent Medicare Payment Advisory Commission ("MedPAC"), a hospital may receive Medicare reimbursement of nearly 1000% more (or approximately $7000 more per patient) for treatment and billing of an admitted patient with chest-pain on an inpatient basis as compared to what the hospital would receive by treating and billing the patient in outpatient observation status.  MedPAC, *Recent Growth in Hospital Observation Care* (Sept. 13, 2010), http://www.medpac.gov/transcripts/ obse3rvation%20sept%202010.pdf.  Accordingly, hospitals have a strong financial incentive to steer patients into lucrative (but costly to the patients and their insurers) inpatient admissions rather than

treat patients on an observation basis notwithstanding the patients' appropriate clinical evaluation. Hence, these hospitals must implement certain internal controls and employ safeguards to ensure patient treatment and their applicable billing practices are determined based on appropriate clinical evaluations rather than profit maximization motives.

42.     Under federal law, Medicare reimburses hospitals for treatment that is "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. §1395y(a)(1)(A). Additionally, Medicare disallows payment for services that were not "medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary." Medicare Program Integrity Manual, Chapter 6, §6.5.2. Thus, inpatient care is only appropriate "if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care was provided in a less intensive setting." *Id*. Medicare guidelines additionally require that hospitals maintain a set of admissions criteria for determining whether a patient's condition is serious enough to warrant inpatient treatment.

## FACTUAL ALLEGATIONS

43.     Community Health is a healthcare company that owns, operates or leases community hospitals that offer cost-effective healthcare, including a range of inpatient medical and surgical services, outpatient treatment and skilled nursing care. It is incorporated under the laws of the state of Delaware and its securities are publicly traded on the New York Stock Exchange under the symbol "CYH."

44.     This lawsuit arises out of defendants' breach of fiduciary duties of loyalty and good faith by causing Community Health to blatantly disregard Medicare and Medicaid regulations. In particular, defendants developed and implemented admission criteria that systematically steered patients into medically unnecessary, inpatient admissions instead of treating these patients as outpatients in "observation" status as was clinically required. Defendants were able to ensure that Community Health's hospitals implemented these improper admission

criteria by adopting a management structure that ensured Community Health had control over its hospitals and their admission practices.

45.     Defendants' continuing and ongoing scheme to collect on billings from lucrative, but medically unnecessary and unreasonable, inpatient admissions allowed Community Health to receive hundreds of millions of dollars' worth of unwarranted Medicare payouts, as well as likely payouts from other payer sources.  Defendants then touted these overstated Medicare and Medicaid reimbursement revenues in the Company's public filings which artificially inflated the Company's stock.  Defendants capitalized on their scheme by selling their personally held Community Health stock at artificially inflated prices.

**Defendants' Policy of Improperly Driving Admissions**
**to Boost Medicare Reimbursements**

46.     In contravention to Medicare rules and widely accepted industry standards, defendants caused Community Health to develop admissions criteria that systematically steer medically unnecessary inpatient admissions at its hospitals, improperly increasing its total inpatient admissions, and ultimately resulting in the overbilling of and unwarranted reimbursement from Medicare and other payer sources.

47.     In or around 2000, defendants developed a set of admissions criteria for Community Health known as the "Blue Book" for Community Health physicians and case managers to use in order to justify the admission of a patient into a Community Health hospital.  Unlike the other detailed evidence-based guidelines developed by independent medical professionals and followed by over 75% of hospitals in the United States, the Community Health Blue Book is a relatively short document with little or no reference to medical literature, and has never been subject to external testing or extensive scrutiny by physicians unaffiliated with Community Health.

48.     In addition, the Blue Book's criteria for admitting patients into a Community Health hospital are significantly more lenient, general and subjective than the evidence-based and objective

criteria used by most other hospitals in the healthcare industry. The Blue Book is organized around the most common patient conditions presented at Community Health hospitals (*e.g.*, chest pain, asthma, and congestive heart failure) and presents a series of "Admission Justification[s]" designed to maximize inpatient admissions.

49. The very structure of the Blue Book – with its focus on "Admission Justification" – demonstrates that it is not an objective set of criteria for determining the propriety of treating a patient in observation as opposed to admitting the patient into the hospital. For many conditions that are common among Medicare patients, the Blue Book includes "Admission Justification" criteria that bear little relevance to determining the severity of a patient's condition, are at odds with standard clinical decision-making for determining the proper level of care for patients, and provide an improper clinical basis for admitting a patient into the hospital. Moreover, in many cases, the Blue Book simply fails to include the core criteria utilized by physicians to determine, for a given condition, whether the patient's presenting symptoms are serious enough to require admission into the hospital.

50. Not only did the Blue Book have a strong focus on "Admission Justification," but for years it failed to even mention observation status for certain health classifications. The Blue Book's protocols for patients complaining of potential cardiac issues or respiratory failure, for example, provide significant insight into the Company's improper admissions policies. From at least 2006 through 2008, the operative versions of the Blue Book did not discuss treating a patient complaining of potential cardiac issues in observation status. Rather, from at least 2006 through 2008, the Blue Book only discussed justifications for admitting such patients. While the 2009 version of the Blue Book added a reference to observation status for patients complaining of potential cardiac issues, it included only one justification for this level of treatment. Instead of providing appropriate policies for treating patients in observation status, the 2009 Blue Book had expansive lists of qualifications that justified admitting a patient complaining of potential cardiac issues. Similarly, from at least

2006 through 2009, the operative versions of the Blue Book did not discuss treating a patient complaining of potential respiratory failure in observation status, but instead only identified justifications for admitting such patients.

51.    The changes to the Blue Book in 2010, however, were significant. The 2010 Blue Book reduced the justifications for admitting patients complaining of potential cardiac issues or respiratory failure, added several justifications for treating a patient in observation status, and even reclassified prior admission justifications. In fact, the first admission justification listed for cardiac patients to be admitted as "high and moderate risk levels" in the 2009 Blue Book was reclassified as justification for observation status in the 2010 Blue Book. Tellingly, these changes to the 2010 Blue Book occurred shortly after the Department of Justice ("DOJ") likely began subpoenaing documents from Community Health in connection with the *qui tam* action filed by Nancy Reuille regarding the Company's improper admission policies (*United States ex rel. Reuille vs. Community Health Systems Professional Services Corporation and Lutheran Musculosskeletal Center, LLC d/b/a Lutheran Hospital*).

52.    Defendants incorporated in the Blue Book a significantly more subjective and liberal criteria for admitting patients than the accepted clinical decision-making and evidence-based, clinical criteria used by peer hospital systems across the country. This allowed the Company to funnel more of its patients to inpatient care, in comparison to other hospitals that spurned the Blue Book's subjective and highly discretionary guidelines, and properly admitted patients based on clinical need.

53.    Defendants also established policies and procedures at Community Health in which inpatient admissions were the default position, and assigning patients to observation status was highly discouraged, even in cases where diagnostic testing or short-term treatment was the medically appropriate and best course of care for the patient. Often times, patients were admitted when there was no medical need to admit the patient to the hospital. Indeed, the clinically appropriate decision

in these cases was to place the patient into observation, run the necessary tests or provide the necessary treatment that would allow the physician to rule out a more serious condition, and then discharge the patient. In the event that the tests or treatment did not eliminate the more serious condition, the physician would then admit the patient to the hospital for further treatment. However, the Blue Book flipped the medical practice on its head by steering these patients immediately into admission at Community Health hospitals, quickly discharging the patients after tests and/or treatment ruled out the serious condition, and then billing Medicare for the far more expensive – and wholly unnecessary – inpatient treatment.

54. Defendants ignored Medicare rules and regulations by creating criteria and enforcing practices that directed Community Health's physicians to improperly recommend inpatient admission when such costly treatment was neither "reasonable and necessary" nor "medically necessary," so the Company could overbill Medicare and other payer sources accordingly. This resulted in Community Health hospitals improperly admitting approximately 62,000 to 82,000 Medicare patients from 2006-2009, and approximately 20,000 to 31,000 in 2009 alone.

**Defendants Focus on Increasing Admission
Rates at Community Health Hospitals**

55. Because Community Health's admission policies had a direct impact on increasing the Company's inpatient admissions and corresponding revenues, defendants monitored Community Health hospitals closely to ensure that admission rates increased. Indeed, the Company maintained regular reports on its hospital's admission rates, and reported these findings to the Board at regular intervals.

56. The Division Presidents, for example, provided the Board with regular updates on admission rates in their respective Divisions. For example, during the Board's May 20, 2008, meeting, each of the Division Presidents gave a presentation to the Board discussing how increased admissions was a main success for the Company. During this meeting, the Division Presidents for at

least Divisions I-IV informed the Board that admissions were up in their respective Divisions. In fact, the Division President for Division IV specifically identified several hospitals within that Division had significant growth in admissions. Furthermore, the Division President for Division I also presented to the Board that admissions being "down" at individual facilities created a "challenge."

57.     The Board further discussed the Company's success in terms of increased admission rates during its meetings on September 12, 2007, May 18, 2009, September 2, 2009, May 18, 2010, and September 15, 2010, among other meetings.

58.     In addition to discussing how admission rates were a key driver of Community Health's success, the Board was also informed of the manner in which Community Health planned to increase admission rates. For example, during a May 19, 2009 operations update to the Board, the Board was informed that the Company's "key areas and initiatives on the revenue side include: (a) emergency room management – installation of Pro-Med within 12 months of acquisition and focus on emergency rooms' inpatient admission rates." Similarly, during a May 18, 2010 presentation to the Board, the Board was informed that one of Community Health's "Continued Key Operational Initiatives" includes ProMed utilization. ProMed is an electronic charting system that tracks when a patient has symptoms or conditions that, under the hospital-defined admissions criteria, should be admitted to the hospital.

59.     Community Health particularly focused on how it could increase admission rates in newly acquired hospitals by implementing Community Health's liberal admissions protocol. For example, after Community Health acquired Triad Hospitals, the Board met on September 12, 2007, and discussed how Community Health could cause a 50% increase in admissions at Triad Hospital's emergency department by implementing the ProMed system, and how implementing an "[emergency department] execution" plan would be a "key volume building tool." The Board also discussed "proper and appropriate ways to seek to influence physician behaviors in the care and treatment of

1182636_2

patients." In the year after Community Health acquired Triad Hospitals, the observation rates at Triad Hospitals declined by more than 50%, while the percentage of one-day-stay admissions increased nearly 33%.

60.     Community Health engaged similar tactics to increase admissions rates when it acquired Lutheran Musculoskeletal Center, LLC ("Lutheran Hospital"). After acquiring Lutheran Hospital, Community Health immediately implemented its admissions criteria and began training the hospital's staff to admit patients that could otherwise be treated in observation status in order to increase revenue. Lutheran Hospital's staff were informed that Community Health has an intense focus on case management, and that inpatient status was justified by the criteria set forth in Community Health's Blue Book. Physicians were informed that Community Health has a policy of appealing denials by Medicare of inpatient status rather than to encourage voluntary assignment of a lower level of care and reimbursement. Thus, within a month of Community Health acquiring Lutheran Hospital, the number of patients treated in observation status decreased and cases previously seen as observation status were being admitted as inpatient.

61.     Not surprisingly, the Individual Defendants touted Community Health as "an industry leader in Admissions Growth."

62.     By at least September, 2010, however, the Company was experiencing a significant decline in admission rates as a result of the new admission policies that the Company began to implement after its practices came under review. During a September 15, 2010, Board Meeting, which was also attended by Division Presidents, there was a significant discussion about "the shift in volumes from admissions of a short duration (so called 'one-day' or 'short' stay admissions) to classification as observation patients" that was occurring "[a]cross all regions." The participants also noted that "there are not fewer patients, but the patients are being classified differently." In one of the presentation slides, one of the Division Presidents discussed how the decline in admission

rates was specifically linked to "change in cardiac admission criteria" that led to more observation status and less inpatient status.

**Defendants' False and Misleading Statements**

63.     On February 20, 2007, the defendants caused Community Health to file with the SEC its Form 10-K for the year ended 2006.  In the 10-K, defendants Smith, Cash, Clerico, Fry, North and Watson stated that "[i]n 2006, 41.7% of [the Company's] net operating revenues came from the Medicare and Medicaid programs."  The 10-K further provided:

> ***We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements.  Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously***.

*        *        *

> ***Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs***, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.

*        *        *

> The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels.  Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs.  These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws.  There are also extensive regulations governing a hospital's participation in these government programs. ***If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government programs.***  In addition, government regulations may change.  If that happens, we may have to make changes in our facilities, equipment, personnel, and services so that our hospitals remain certified as hospitals and qualified to participate in these programs.  We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards.

*        *        *

> In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

64.     On April 26, 2007, the defendants caused Community Health to file with the SEC its first quarter 2007 Form 10-Q.  Defendants Smith and Cash estimated reimbursement from the Medicare and Medicaid programs to constitute 41.4% of the Company's net operating revenue for the quarter.

65.     On July 31, 2007, the defendants caused Community Health to file with the SEC its second quarter 2007 Form 10-Q.  Defendants Smith and Cash estimated reimbursement from the Medicare and Medicaid programs to constitute 41.1% of the Company's net operating revenue for the quarter.

66.     On November 2, 2007, the defendants caused Community Health to file with the SEC its third quarter 2007 Form 10-Q.  Defendants Smith and Cash estimated reimbursement from the Medicare and Medicaid programs to constitute 38.4% of the Company's net operating revenue for the quarter.

67.     On February 29, 2008, the defendants caused Community Health to file with the SEC its Form 10-K for the year ended 2007.  Defendants Smith, Cash, Clerico, Fry, North and Watson reported that "[i]n 2007, 39.3% of [the Company's] net operating revenues came from the Medicare and Medicaid programs." The 10-K further provided:

> *We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements.  Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously*.

> \*          \*          \*

> *Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs*, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.

> \*          \*          \*

> The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels.  Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs.  These requirements

relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws. There are also extensive regulations governing a hospital's participation in these government programs. *If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government programs*. In addition, government regulations may change. If that happens, we may have to make changes in our facilities, equipment, personnel, and services so that our hospitals remain certified as hospitals and qualified to participate in these programs. *We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards*.

*　　*　　*

In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

68.    On May 2, 2008, the defendants caused Community Health to file with the SEC its first quarter 2008 Form 10-Q. Defendants Smith and Cash estimated reimbursement from the Medicare and Medicaid programs to constitute 36.8% of the Company's net operating revenue for the quarter.

69.    On August 5, 2008, the defendants caused Community Health to file with the SEC its second quarter 2008 Form 10-Q. Defendants Smith and Cash estimated reimbursement from the Medicare and Medicaid programs to constitute 36.2% of the Company's net operating revenue for the quarter.

70.    On October 31, 2008, the defendants caused Community Health to file with the SEC its third quarter 2008 Form 10-Q. Defendants Smith and Cash estimated reimbursement from the Medicare and Medicaid programs to constitute 35.5% of the Company's net operating revenue for the quarter.

71.    On February 27, 2009, the defendants caused Community Health to file with the SEC its Form 10-K for the year ended 2008. Defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson claimed that "[i]n 2008, 36.6% of [the Company's] net operating revenues came from the Medicare and Medicaid programs." The 10-K further provided:

*We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements. Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously*.

\*       \*       \*

*Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs*, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.

\*       \*       \*

The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels. Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws. There are also extensive regulations governing a hospital's participation in these government programs. *If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government programs*. In addition, government regulations may change. If that happens, we may have to make changes in our facilities, equipment, personnel, and services so that our hospitals remain certified as hospitals and qualified to participate in these programs. *We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards*.

\*       \*       \*

In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

72.    On April 29, 2009, the defendants caused Community Health to file with the SEC its first quarter 2009 Form l0-Q. Defendants Smith and Cash stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement to constitute 36.2% of net operating revenue for the quarter.

73.    On July 31, 2009, the defendants caused Community Health to file with the SEC its second quarter 2009 Form 10-Q. Defendants Smith and Cash stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement to constitute 36.2% of net operating revenue for the quarter.

74.     On October 30, 2009, the defendants caused Community Health to file with the SEC its third quarter 2009 Form 10-Q.  Defendants Smith and Cash stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement to constitute 37.1% of net operating revenue for the quarter.

75.     On February 26, 2010, the defendants caused Community Health to file with the SEC its Form 10-K for the year ended 2009.  Defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson stated "[i]n 2009, 36.9% of [the Company's] net operating revenues came from the Medicare and Medicaid programs."  The 10-K further provided:

> ***We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements.  Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously***.

*        *        *

> ***Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs***, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.

*        *        *

> The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels.  Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs.  These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws.  There are also extensive regulations governing a hospital's participation in these government programs.  ***If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government programs***.  In addition, government regulations may change.  If that happens, we may have to make changes in our facilities, equipment, personnel, and services so that our hospitals remain certified as hospitals and qualified to participate in these programs.  ***We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards***.

*        *        *

In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

76.     On April 28, 2010, the defendants caused Community Health to file with the SEC its first quarter 2010 Form 10-Q.  Defendants Smith and Cash stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement constituted 37.8% of net operating revenue for the quarter.

77.     On July 30, 2010, the defendants caused Community Health to file with the SEC its second quarter 2010 Form 10-Q.  Defendants Smith and Cash stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement constituted 38.2% of net operating revenue for the quarter.

78.     On October 29, 2010, the defendants caused Community Health to file with the SEC its third quarter 2010 Form 10-Q.  Defendants Smith and Cash stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement constituted 38% of net operating revenue for the quarter.

79.     On February 25, 2011, the defendants caused Community Health to file with the SEC its Form 10-K for the year ended 2010.  Defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson stated that "[i]n 2010, 37.8% of [the Company's] net operating revenues came from the Medicare and Medicaid programs."  The 10-K further provided:

> *We maintain quality assurance programs to support and monitor quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements.  Patient care evaluations and other quality of care assessment activities are reviewed and monitored continuously.*

> \*          \*          \*

> *Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs*, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs.

> \*          \*          \*

The healthcare industry is required to comply with extensive government regulation at the federal, state, and local levels. Under these regulations, hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, maintenance of adequate records, hospital use, rate-setting, compliance with building codes, and environmental protection laws. There are also extensive regulations governing a hospital's participation in these government programs. ***If we fail to comply with applicable laws and regulations, we can be subject to criminal penalties and civil sanctions, our hospitals can lose their licenses and we could lose our ability to participate in these government programs***. In addition, government regulations may change. If that happens, we may have to make changes in our facilities, equipment, personnel, and services so that our hospitals remain certified as hospitals and qualified to participate in these programs. ***We believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards***.

\*       \*       \*

In the future, we expect the percentage of revenues received from the Medicare program to increase due to the general aging of the population.

80.    On April 29, 2011, the defendants caused Community Health to file with the SEC its first quarter 2011 Form 10-Q. Defendants Smith and Cash stated that the Company receives "a substantial portion of [its] revenues from the Medicare and Medicaid programs" and estimated that reimbursement constituted 37.1% of net operating revenue for the quarter.

81.    The above statements were each false and misleading and therefore a breach of defendants' fiduciary duties owed to Community Health. At the time that each of these statements was made, defendants' knew or should have known that Community Health was required to comply with Medicare reimbursement standards as well as related Medicaid requirements. Nonetheless, under defendants' management and control, Community Health implemented admissions criteria to systematically steer medically unnecessary inpatient admissions at Community Health hospitals. These artificial increases in inpatient admissions resulted in substantially higher and unwarranted reimbursements from Medicare and Medicaid, while Medicare and Medicaid reimbursements actually constituted a much smaller percentage of the Company's revenue.

## DEFENDANTS' UNLAWFUL INSIDER SELLING

82.     The defendants' knowledge of Community Health's improper inpatient-admissions and billing practices is also demonstrated by their sales of personally-held Company stock while their scheme artificially inflated Community Health stock.  Defendants were privy to adverse, non-public information which they exploited for their own benefit, to the exclusion of other shareholders, by selling their Company stockholdings before the truth came to light.  While continuously making improper statements regarding Community Health's revenues, which were derived from improper Medicare and Medicaid reimbursements, certain defendants sold massive amounts of Company stock in order to capitalize on the Company's inflated stock price that they had helped create.

83.     Combined, defendants Cash and Smith sold over $33.8 million worth of their Company stock during the Relevant Period from the first improper statement made by defendants on February 20, 2007, until the truth came out on April 11, 2011.  Defendants Cash and Smith's illicit stock sales are detailed below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **CASH** | 8/4/2009 | 240,000 | $30.79 | $7,388,400.00 |
| | 4/26/2010 | 240,000 | $40.34 | $9,681,360.00 |
| | | **480,000** | | **$17,069,760.00** |
| | | | | |
| **SMITH** | 5/20/2009 | 250,000 | $26.07 | $6,518,650.00 |
| | 5/13/2010 | 243,093 | $41.02 | $9,971,917.95 |
| | 5/14/2010 | 6,907 | $40.50 | $279,733.50 |
| | | **500,000** | | **$16,770,301.45** |
| | | | | |
| | | | | |
| **TOTAL** | | **980,000** | | **$33,840,061.45** |

## DAMAGES TO COMMUNITY HEALTH

84.     As a result of defendants' misconduct and improper statements, Community Health has already incurred significant damages, and the ensuing cost to the Company will only grow worse.  The Company's violations of Medicare regulations and widely accepted standards of patient

care have exposed Community Health to significant costs, expenses, damages, fines and the risk of exclusion from the Medicare program.

85.     Defendants' improper and unsustainable inpatient-admission practices have, and will continue to, severely harm the Company. The defendants caused Community Health to systematically overbill Medicare and other payers by causing patients to be admitted to Community Health hospitals when Medicare/Medicaid regulations and industry practice is to treat them in outpatient observation. From 2006-2009, the Company likely received between $280 million and $377 million from the inpatient treatment of these improperly admitted Medicare patients. In turn, Community Health is in danger of incurring significant liability arising from its improper Medicare-billing practices which include treble damages and a penalty of up to $11,000 per false claim. In addition, the defendants have jeopardized the Company's eligibility to participate in the Medicare program which would severely impact its potential future earnings. The defendants' misconduct also resulted in similar improper reimbursements from private payers and state Medicare and Medicaid programs that the Company will likely have to relinquish.

86.     As a consequence of defendants' faulty inpatient admissions and billings practices, Community Health's hospital in Laredo, Texas, has come under investigation by the Office of Inspector General ("OIG") of the U.S. Department of Health and Human Services ("DHHS"), which has requested documents related to matters including "case management, resource management, admission criteria, patient medical records, coding [and] billing." Specifically, on February 25, 2011, the defendants caused Community Health to file its Form 10-K with the SEC which stated:

> On December 7, 2009, we received a document subpoena from the U.S. Department of Health and Human Services, Office of the Inspector General, or OIG, requesting documents related to our hospital in Laredo, Texas. The categories of documents requested included case management, resource management, admission criteria, patient medical records, coding, billing, compliance, the Joint Commission accreditation, physician documentation, payments to referral sources, transactions involving physicians, disproportionate share hospital status, and audits by the hospital's Quality Improvement organization. On January 22, 2010, we received a "request for information or assistance" from the OIG's Office of Investigation

requesting patient medical records from Laredo Medical Center in Laredo, Texas for certain Medicaid patients with an extended length of stay. Additional requests for records have also been received, including a request containing follow-up questions received on January 5, 2011. We are cooperating fully with these investigations.

87. In addition, as a further consequence of defendants' faulty inpatient admissions and billings practices, Community Health faces an investigation by the Texas Attorney General concerning "emergency department procedures and billing" at each of its 18 Texas hospitals. Specifically, on February 25, 2011, the defendants caused Community Health to file its Form 10-K with the SEC which stated:

> On November 15, 2010, we were served with substantially identical Civil Investigative Demands (CIDs) from the Office of Attorney General, State of Texas for all our 18 affiliated Texas hospitals. The subject of the requests appears to concern emergency department procedures and billing. We are cooperating fully with these requests. Because we are in the early stages of this investigation, we are unable to evaluate the outcome of this investigation.

88. Defendants' actions have also exposed Community Health to a lawsuit for violations of the federal securities laws brought by Tenet, *Tenet Healthcare Corp. v. Community Health Systems, Inc., et al.*, No. 3:11-cv-00732-M (N.D. Texas). In the lawsuit filed April 11, 2011, Tenet alleges that Community Health made material misstatements and omissions about its inpatient-admissions practices while attempting to acquire Tenet. These false and misleading statements in Community Health's proxy statements and other SEC filings likely violated federal securities laws. Specifically, Tenet alleged that Community Health engaged in a practice to under-utilize observation status and over-utilize inpatient admission status and asserts that by doing so, Community Health created undisclosed financial and legal liability to federal, state and private payors. The suit seeks declaratory and injunctive relief and Tenet's costs. In addition, the false and misleading statements also exposed the Company to expensive-to-defend securities class action lawsuits.

89. As a result of Community Health's undisclosed business practices and liabilities, the Company's stock price has been artificially inflated for a number of years. Because of this, on April 11, 2011, the day that the Tenet lawsuit was filed, Community Health's stock price sank 36%, or

$14.41 per share, to $25.89, the biggest one-day decline since the Company first offered shares to the public on June 8, 2000. The Company's plummeting stock price wiped out over $1.2 billion in shareholder equity. The Company's staggering drop in market capitalization has decimated its bottom line and eliminated any chance Community Health had at acquiring Tenet. To this end, on May 10, 2011, Community Health withdrew its offer to purchase Tenet. According to the Company's December 9, 2010 press release regarding the proposed acquisition of Tenet, "[t]he combination of CHS and Tenet would be both financially and strategically compelling. The combined company would have approximately $22 billion in pro forma annual revenue and own or operate 176 hospitals in 30 states with a total of 32,830 licensed beds." Thus, defendants' breaches of their fiduciary duties *have* caused the Company to lose out on a lucrative business opportunity.

90. Moreover, as a further consequence of defendants' faulty inpatient admissions and billings practices, Community Health received a subpoena from the DHHS requesting documents relating to emergency department procedures. Specifically, on April 15, 2011, the defendants caused Community Health to file a SEC Form 8-K which stated:

> On Friday, April 8, 2011, Community Health Systems, Inc. received a document subpoena, dated March 31, 2011, from the U.S. Department of Health and Human Services, Office of the Inspector General (the "OIG"), in connection with an investigation of possible improper claims submitted to Medicare and Medicaid. The subpoena, issued from the OIG's Chicago, Illinois office, requests documents from all of our hospitals and appears to concern emergency department processes and procedures, including our hospitals' use of the Pro-MED Clinical Information System, which is a third-party software system that assists with the management of patient care and provides operational support and data collection for emergency department management and has the ability to track discharge, transfer, and admission recommendations of emergency department physicians. The subpoena also requests other information about our relationships with emergency department physicians, including financial arrangements. The subpoena's requests are very similar to those contained in the Civil Investigative Demands received by our Texas hospitals from the Office of the Attorney General of the State of Texas on November 15, 2010 (and disclosed in our Annual Report on Form 10-K for the year ended December 31, 2010, p. 39). We do not know if the subpoena is related in any way to the allegations contained in the lawsuit styled *Tenet Healthcare Corporation vs. Community Health Systems, Inc., et al.* (No. 3:11-cv-00732-M) filed in the U.S. District Court for the Northern District of Texas on April 11, 2011. We are

cooperating fully with the OIG in connection with this subpoena and are currently unable to predict the outcome of this investigation.

91. Defendants' faulty inpatient-admissions and billings practices have also caused Community Health to face a potential lawsuit brought under the FCA resulting from Medicare billing practices at one of its Indiana hospitals. Specifically, on April 22, 2011, the defendants caused Community Health to file a SEC Form 8-K which stated:

> Today, Community Health Systems, Inc. (the "Company") was contacted by the U.S. Department of Justice regarding a complaint styled *United States ex rel. Reuille vs. Community Health Systems Professional Services Corporation and Lutheran Musculosskeletal Center, LLC d/b/a Lutheran Hospital*, filed in the Northern District of Indiana, Fort Wayne Division. The lawsuit was originally filed under seal on January 7, 2009. The suit is brought under the False Claims Act and alleges that Lutheran Hospital of Indiana billed the Medicare program for (a) false 23 hour observation after outpatient surgeries and procedures, and (b) intentional assignment of inpatient status to one-day stays for cases that do not meet Medicare criteria for inpatient intensity of service or severity of illness. The relator had worked in the case management department of Lutheran Hospital of Indiana but was reassigned to another department in the fall of 2006. This facility was acquired by the Company as part of the July 25, 2007 merger transaction with Triad Hospitals, Inc. The complaint also includes allegations of age discrimination in Ms. Reuille's 2006 reassignment and retaliation in connection with her resignation on October 1, 2008. The Company had cooperated fully with the government in its investigation of this matter, but had been unaware of the exact nature of the allegations in the complaint.
>
> On December 27, 2010, the government filed a notice that it declined to intervene in this suit. That same day, an order was filed directing that the complaint be unsealed and served on the defendants by the relator. The suit has not been served on the defendants and the Company was not notified of these orders. Also today, April 22, 2011, the government advised the Company that it is considering this suit in light of the investigation that is the subject of the subpoena we received from the U.S. Department of Health and Human Services, Office of the Inspector General, on April 8, 2011. We are cooperating with them in that evaluation.

92. Worse, the United States Department of Justice ("DOJ") has decided to intervene in the FCA action. The DOJ disclosed that it consolidated the related federal investigations into improper billing for inpatient care at Community Health hospitals. Specifically, on April 25, 2011, the defendants caused Community Health to file a SEC Form 8-K which stated:

> After furnishing a Form 8-K on Friday, April 22, 2011, Community Health Systems, Inc. (the "Company") obtained a copy of a joint motion filed Friday afternoon by the relator and the U.S. Department of Justice in the case styled *United States ex rel. and*

*Reuille vs. Community Health Systems Professional Services Corporation and Lutheran Musculosskeletal Center, LLC d/b/a Lutheran Hospital*, filed in the United States District Court for the Northern District of Indiana, Fort Wayne Division. The government had previously declined to intervene in this case. The motion contains additional information about how the government intends to proceed with an investigation regarding "allegations of improper billing for inpatient care at other hospitals associated with Community Health Systems, Inc. . . . asserted in other *qui tam* complaints in other jurisdictions." The motion states that the Department of Justice has now "consolidated its investigations" of the Company and other related entities and that "the Civil Division of the Department of Justice, multiple United States Attorneys' offices, and the Office of Inspector General for the Department of Health and Human Services (HHS) are now closely coordinating their investigation of these overlapping allegations. The Attorney General of Texas has initiated an investigation; the United States intends to work cooperatively with Texas and any other States investigating these allegations." The motion also states that the Office of Audit Services for the Office of Investigations for HHS has been engaged to conduct a national audit of certain of the Company's Medicare claims. The government confirmed that it considers the allegations made in the complaint styled *Tenet Healthcare Corporation vs. Community Health Systems, Inc., et al.* filed in the United States District Court for the Northern District of Texas, Dallas Division on April 11, 2011 to be related to the allegations in the *qui tam* and to what the government is now describing as a consolidated investigation.

Because *qui tam* suits are filed "under seal," no one but the relator and the government knows that the suit has been filed or what allegations are being made by the relator on behalf of the government. Initially, the government has sixty (60) days to make a determination about whether to intervene in a case and to act as the plaintiff or to decline to intervene and allow the relator to act as the plaintiff in the suit, but extensions of time are frequently granted to allow the government additional time to investigate the allegations. Even if, in the course of an investigation, the court partially unseals a complaint to allow the government and a defendant to work to a resolution of the complaint's allegations, the defendant is prohibited from revealing to anyone even that the partial unsealing has occurred. As the investigation proceeds, we may learn of additional *qui tam* suits filed against the Company or its affiliated hospitals or related entities, or that contact letters, document requests, or medical record requests we have received in the past from various governmental agencies are generated from *qui tam* cases filed under seal.

The motion filed Friday concludes by requesting a stay of the litigation in the *Reuille* case for 180 days. Our management company subsidiary, Community Health Systems Professional Services Corporation, the defendant in the *Reuille* case, consented to the request for the stay. As always, we will cooperate with the government in any investigation.

93. By causing Community Health to come under the scrutiny of the DOJ, defendants have exposed the Company to significant additional liability. Since 2007, the DOJ has announced at least four multi-million dollar settlements with hospitals over improper billing of observation

patients as admissions, so a potential settlement between Community Health and the DOJ in the present case will come at a considerable cost to the Company.

94.     On May 18, 2011, the Company filed a Form 8-K disclosing, among other things, that it had received two additional subpoenas pursuant to the federal government's investigation into Community Health's inpatient-admissions and Medicare billing practices.  In particular, the Company revealed that it received a subpoena from the SEC requesting documents related to its "emergency room admissions or observation practices at [its] hospitals," and also documents "relied upon by the Company in responding to the Tenet litigation, as well as other communications about the Tenet litigation."  Also, the Company disclosed in its Form 8-K that it received a subpoena from the Houston office of the DHHS requesting a total of 71 patient medical records from its Shelbyville, Tennessee hospital to be rendered to the federal prosecutors handling the investigation into Community Health's Laredo hospital.

95.     The increased scrutiny facing the Company has also forced defendants to announce over each of the last six quarters that the Company has reclassified patients as observation who had previously been billed as admitted for "one-day stays."  Specifically, in quarterly earnings calls, defendant Cash announced:

- "Additionally, we did see a decline in one-day stays that affects inpatient volume and a corresponding increase in outpatient observation visits."  Q1 2009 Earnings Call;

- "Reductions in one-day stays with a corresponding increase in outpatient observations" of 50 BPS contributed to a decline in same-store volume.  Q1 2010 Earnings Call;

- A "reduction in one-day admissions, with a corresponding increase in outpatient observations" and "movement of the one day stays to observation."  Q2 2010 Earnings Call;

- "Again, soft volumes continued throughout the third quarter.  The following contribute to the decline . . . reductions to one-day stays with the [corresponding] increase in the outpatient observation, 70 basis points."  Q3 2010 Earnings Call; and

- For the fourth quarter of 2010 "[r]eductions in one-day stays for corresponding increase in outpatient observations are 100 basis points" and, in 2010, total

"movement of one-day stays to observation was 70 basis points." Q4 2010 Earnings Call.

96.     Finally, defendants compromised Community Health's business and its reputation with its patients, business partners, regulators, and shareholders by accruing payments for services that were not reasonable and medically necessary to serve the patient in order to pad the Company's bottom line. In doing so, Community Health wholly disregarded the fundamental principles of medical care by failing to treat patients according to their individual clinical needs.

97.     In sum, Community Health may have improperly received as much as $377 million as a result of defendants' systematic overbilling of Medicare through its inpatient-admissions practices. Additionally, because the DOJ may impose treble damages for false Medicare claims, and pursuant to the FCA, the Company stands to incur a penalty of up to $11,000 per claim for each of Community Health's 62,000 to 82,000 potentially improperly billed claims. In all, Community Health may face well over $1 billion in liabilities resulting from defendants' actions during the 2006 to 2009 period. Worse, the foregoing $1 billion in potential damages and penalties does not even include the Company's potential liabilities to other payers who may have been harmed by defendants' admissions practices, including insurance companies, state Medicaid programs, employers and patients. Community Health may also incur additional investigatory costs and fines and penalties imposed by the DOJ and state regulatory agencies, as well as myriad private lawsuits that are likely to result. Further, in the Company's Form 10-Q filed October 28, 2011, it disclosed that, during the nine months ending September 30, 2011, alone, Community Health incurred over $12 million in pre-tax charges in connection with the Tenet lawsuit, government investigations, and shareholder lawsuits regarding defendants' improper inpatient-admission practices.

98.     The depth and magnitude of the defendants' misconduct has caused the Institutional Shareholder Services ("ISS"), a renowned independent proxy advisor, to recommend against re-electing defendant Fry in the most recent shareholders' annual meeting. In support of its

recommendation to vote "against" re-electing defendants Cash and Fry, ISS cited to "their failure to take appropriate action regarding the 'significant allegations' concerning Community's Medicare billing practices." The recommendation from ISS also expressed concern regarding the lack of adequate disclosure to shareholders regarding the Company's billing practices.

99. Additionally, CtW Investment Group, another leading investment advisor, "welcomed the news . . . that leading independent proxy advisor ISS Governance Services recommended that their clients vote against [re-electing Fry]." In fact, CtW Investment Group similarly urged Community Health shareholders to vote against re-electing defendant Fry, as well as the Company's CFO, defendant Cash. CtW Investment Group specifically cautioned investors that the Audit Committee members "bear central responsibility for oversight of the potentially fraudulent billing practices."

100. Nevertheless, despite the Audit Committee's involvement in the alleged wrongdoing, the Company's interested Board placed the members of the Audit Committee in charge of Community Health's internal investigation into the very wrongdoing that these defendants engaged in. Not surprisingly, CtW Investment Group warned investors that the Audit Committee's "actions in response to these significant allegations do not appear to reflect an adequately high level of scrutiny of the company's billing practices."

101. In any event, despite the defendants' apparent role and responsibility in causing the Company to steer medically unnecessary inpatient admissions at Community Health hospitals, the Company has yet to institute any legal action against defendants. By this action, plaintiffs seek redress for and vindication of Community Health's rights against its wayward fiduciaries.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

102. Plaintiffs incorporate ¶¶1-101.

103. Plaintiffs bring this action derivatively for the benefit of Community Health to obtain redress for the injuries suffered, and to be suffered, by Community Health as a result of defendants'

breaches of fiduciary duty. Community Health is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

104. Plaintiffs were shareholders of Community Health at the time of the continuing wrong complained of. The continuing wrong included causing the Company to engage in illegal business practices by overbilling Medicare, Medicaid, and other payers, and the issuance of improper statements regarding the Company's financial results and business operations. Once plaintiffs became shareholders, they have continuously been shareholders.

105. Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

106. As of the date of the commencement of this action, the Board of the Company consisted of the following eight individuals: James S. Ely and defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson.

107. As particularized above, these defendants breached their fiduciary duty of loyalty (and candor and good faith) and engaged in unlawful conduct. Moreover, defendants Smith and Cash each possess individual conflicts of interest that hopelessly prevent an independent and disinterested evaluation of any demand against certain of their fellow defendants. Accordingly, plaintiffs have not made any demand on the Board because such a demand would be a futile and useless act, particularly for the reasons stated below.

**Demand Is Excused as to Smith and Cash**
**Because They Lack Independence**

108. The principal professional occupation of defendants Smith and Cash are their employment with Community Health, pursuant to which they have received and continue to receive substantial monetary compensation and other benefits as alleged above. As a result, defendants Smith and Cash lack independence from the remaining director defendants due to their interest in

maintaining their executive positions at Community Health. This lack of independence renders defendants Smith and Cash incapable of impartially considering a demand to commence and vigorously prosecute this action. Community Health paid defendants Smith and Cash the following compensation:

| Defendant | Year | Salary | Restricted Stock Awards | Option Awards | All Other Comp | Total |
|-----------|------|--------|-------------------------|---------------|----------------|-------|
| Smith | 2010 | $1,365,000 | $6,780,000 | $418,500 | $12,397,069 | $20,960,569 |
| | 2009 | $1,300,000 | $4,545,000 | $303,000 | $11,687,990 | $17,835,990 |
| | 2008 | $1,080,000 | $3,228,000 | $1,510,000 | $4,857,267 | $10,675,267 |
| | 2007 | $1,035,000 | $12,919,300 | $6,556,000 | $3,339,801 | $23,850,101 |

| Defendant | Year | Salary | Restricted Stock Awards | Option Awards | All Other Comp | Total |
|-----------|------|--------|-------------------------|---------------|----------------|-------|
| Cash | 2010 | $735,000 | $2,712,000 | $250,500 | $4,390,623 | $8,088,123 |
| | 2009 | $700,000 | $1,818,000 | $121,200 | $4,335,003 | $6,974,203 |
| | 2008 | $664,000 | $1,936,800 | $453,000 | $2,088,363 | $5,142,163 |
| | 2007 | $644,000 | $6,273,600 | $2,829,600 | $1,322,422 | $11,079,642 |

In sum, defendants Smith and Cash are incapable of impartially considering a demand to commence and vigorously prosecute this action because they had an interest in maintaining their respective principal occupation and the substantial compensation they receive in connection with that occupation. Demand is therefore futile as to defendants Smith and Cash.

109. Defendants Smith and Cash also share a personal relationship that dates back to 1973 when they held various positions with Humana, a Fortune 100 Company that markets and administers health insurance. At Humana, defendants Smith and Cash both served in executive positions until their joint departure in 1996, when they decided to venture together at Community Health. Since 1997, defendants Smith and Cash have worked side by side at Community Health in executive and directorial roles, managing and overseeing the daily operations of the Company. In fact, it is their joint mismanagement of Community Health that has decimated the Company and exposed it to several lawsuits, staggering penalties and severe sanctions. Hence, their deeply-rooted

partnership that spans over 38 years and their joint involvement in the misconduct detailed herein raises a reasonable doubt that they can independently and in a disinterested fashion consider instituting a legal action against each other. Accordingly, demand is futile as to defendants Smith and Cash.

110. Defendant Cash is also beholden to the Board for the extensive privileges and perquisites afforded him and his immediate family members since as far back as 2000. Since at least 2000, the Company has employed defendant Cash's son, Brad Cash ("B. Cash"), in various well-paying positions in its hospitals, including as a financial analyst, assistant CFO, CFO and a divisional financial executive. In total, the Company has paid B. Cash more than $2.31 million in compensation for his services, as detailed in the table below:

| Year | Position | Total Compensation |
|------|----------|--------------------|
| 2000 | Financial Analyst/Assistant CFO of 1 Hospital | $65,945 |
| 2001 | Group Financial Analyst/CFO of 1 Hospital | $90,457 |
| 2002 | CFO of 1 Hospital | $84,929 |
| 2003 | CFO of 2 Hospitals | $142,801 |
| 2004 | CFO of 1 Hospital | $140,901 |
| 2005 | CFO of 1 Hospital | $182,368 |
| 2006 | CFO of 2 Hospitals | $219,822 |
| 2007 | CFO of 1 Hospital/Divisional Financial Executive | $196,257 |
| 2008 | Divisional Financial Executive | $295,400 |
| 2009 | Divisional Financial Executive | $370,440 |
| 2010 | Divisional Financial Executive | $587,050 |
| Total | | $2,376,370 |

111. Further, the Company has made significant investments in Greenwood Marketing and Management ("GMM"), a business owned and operated by defendant Cash's wife, Anita Greenwood Cash ("A. Cash"). The Company paid GMM approximately $239,000, $207,000, $196,000 and

$114,000, in 2000, 2001, 2002, and 2003, respectively, for unspecified marketing services, postage, magazines, handbooks, sales brochures, training manuals and membership services. Finally, the Board also paid Cross Country, a company for which defendant Cash has served as a director since October 2001, for unidentified healthcare staffing services. In total, Cross Country has provided healthcare staffing services to Community Health resulting in revenues to Cross Country of more than $12,912,359, as detailed in the table below:

| Year | Revenues to Cross Country |
|------|---------------------------|
| 2001 | $61,437 |
| 2003 | $1,416,159 |
| 2004 | $2,006,523 |
| 2005 | $1,852,936 |
| 2006 | $1,600,828 |
| 2007 | $2,500,000 |
| 2008 | $2,500,000 |
| 2009 | $650,721 |
| 2010 | $323,755 |
| Total | $12,912,359 |

112.     As the foregoing demonstrates, the Board extended defendant Cash and his immediate family members every privilege and lucrative perquisites that it has not afforded other executive members. As such, defendant Cash is indebted to the Board, and hopelessly conflicted and unable to render independent and disinterested judgment upon a demand to institute litigation against them. Hence, demand is futile as to defendant Cash.

**Demand Is Excused Because the Board's Conduct**
**Is Not a Valid Exercise of Business Judgment**

113.     Defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson's challenged misconduct at the heart of this case constitutes the direct facilitation of improper inpatient-admission practices, and violations of federal and state laws and regulations that threaten the Company's very survival. As the ultimate decision-making body of the Company, the Board affirmatively adopted,

implemented, and condoned a business strategy and model based on deliberate and widespread improper activities, while disregarding their duties to their patients and shareholders. Defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson's misconduct was especially egregious because it was designed to defraud the federal and state government, and taxpayers, in order to derive a greater personal profit for themselves. These defendants' wrongdoings have exposed the Company to significant civil liability and draconian penalties pursuant to the FCA. Causing the Company to engage in improper and illegal conduct that threatens its survival is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

**Demand Is Excused as to the Board Because**
**They Face a Substantial Likelihood of Liability**

114. Demand is futile as to defendant Smith because as the CEO, Chairman and President of Community Health, CEO and President of CHSPSC and an officer and/or director of certain of Community Health's hospitals, he knowingly or recklessly implemented and maintained an unsustainable inpatient admissions policy solely focused on maximizing the amount of reimbursement the Company could receive from federal, state, and other payer sources notwithstanding the legal implications. As a result, the Company is mired in a litany of investigations and lawsuits, and has been charged with violating certain Medicare and Medicaid regulations which threaten to cutoff a significant source of its revenue – Medicare and Medicaid funding. Further, defendant Smith knowingly or recklessly made improper statements in the Company's public filings concerning its revenue derived from Medicare and Medicaid, and exploited the resulting boost in the price of Community Health's stock by selling his personally owned shares of the Company's stock. As CEO, Chairman and President of the Company, defendant Smith had the utmost duty and responsibility to ensure that the Company was in compliance with all federal and state laws and regulations. Instead, in a direct breach and dereliction

of his fiduciary duties, defendant Smith knowingly or recklessly engaged in misconduct that has exposed the Company to billions of dollars in liability and sanctions. Because defendant Smith faces a substantial likelihood of liability for breaching his fiduciary duty of loyalty, demand upon him is futile.

115. Defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson face a substantial likelihood of liability because they intentionally, knowingly, or recklessly, caused, authorized, and/or allowed Community Health to engage in improper inpatient admissions practices which they knew were unsustainable because they were in direct contravention of federal and state laws and regulations. Their failure is especially egregious given their knowledge that a violation of the Medicare or Medicaid regulations could render the Company ineligible to further participate in those programs, and that Medicare and Medicaid revenue was critical to the Company's operations. Further, defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson also made improper statements in the Company's public filings that vastly overstated its revenue figures derived from Medicare and Medicaid reimbursements. Defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson's misconduct has exposed the Company to a billion dollars' worth of liability, and placed Community Health at the mercy of federal regulators who will likely impose harsh penalties and sanctions against it to deter similar conduct in the industry. Because defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson face a substantial likelihood of liability for breaching their fiduciary duties of loyalty, demand upon them is futile.

116. Defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson, as members of the Board, were and are subject to the Company's Code. The Code went well beyond the basic fiduciary duties required by applicable laws, rules and regulations. The Code required defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson to conduct their business affairs "with the highest ethical and legal standards." Further, the Code forbade defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson from engaging "in any intentional deception or misrepresentation

intended to influence any entitlement or payment under any federal healthcare benefit program" and directed them to "adhere to all official coding and billing guidelines, rules, regulations, statutes, and laws." In particular, the Policy explicitly prohibited defendants from violating the FCA. This they did not do. As detailed herein, defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson violated the Code by causing or allowing the Company to engage in improper and illicit inpatient admission practices that were in violation of federal and state regulations. Consequently, these defendants also knew the Company received unwarranted reimbursements from Medicare, Medicaid, and other payer sources as a result of the improper admissions criteria, and as a result the Company's reported earnings results were vastly overstated. Because defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson violated the Code by engaging in illegal, dishonest, and unethical conduct, they face a substantial likelihood of liability for breaching their fiduciary duties and demand upon them is futile.

117. Because the Company's internal controls were designed to filter information relevant to Community Health's admission protocol and corresponding admission rates and compliance with Medicare and Medicaid regulations to the Board, the entire Board knew about Community Health's inflated rate of inpatient admissions. In fact, the Company's Board is required to investigate any allegation of improper conduct, practice or behavior. Thus, defendants Smith, Cash, Clerico, Fry, Jennings, North and Watson all knew that the admission criteria was improper and resulted in inflated inpatient admissions. All members of the Board received regular updates from Division Presidents on the Company's admission rates. Moreover, defendants Clerico and Fry received regular reports from Andi Bosshart ("Bosshart"), the Vice President of Corporate Compliance and Community Health's Privacy Officer. Bosshart stated in an April 28, 2011 Conference Call that she regularly reports to the Audit and Compliance Committee regarding Community Health's compliance with Medicare and Medicaid regulations. Thus, defendants Clerico and Fry also knew that the Company was directing patients into inpatient treatment at a rate that was much higher than

its peers. In fact, they were proud that Community Health was "an industry leader in Admissions Growth."

118. Defendants Clerico and Fry as members of the Audit Committee during the misconduct detailed herein also had additional and heightened responsibility under the Audit Committee Charter to oversee "the integrity of the Company's financial statements" and its "compliance with legal and regulatory requirements." Thus, the Audit Committee Defendants violated the Audit Committee Charter by knowingly or recklessly allowing the Company to engage in improper inpatient-admissions practices in violation of federal and state regulations, and by making and approving improper statements in its public filings. Accordingly, the Audit Committee Defendants breached their fiduciary duties of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Clerico and Fry face a substantial likelihood of liability for their breaches of fiduciary duties, and any demand upon them is futile.

119. Defendants Smith and Cash face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith by selling their personally held shares of the Company's stock for approximately $33.8 million in profits while Community Health's stock price was artificially inflated. The Company's stock price was inflated due to improper statements made and approved by the defendants, which overstated the Company's revenues derived from Medicare and Medicaid reimbursements. As members of the Board, these defendants were privy to adverse, non-public information concerning the Company's improper and unsustainable inpatient-admissions practices, and knew that the Company's stock was artificially inflated due to their improper statements regarding revenues derived from Medicare and Medicaid sources. As detailed herein, defendants Smith and Cash exploited this information for their own personal gain and effectively profited from their own misconduct. Accordingly, defendants Smith and Cash face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith, and demand upon them is futile.

120.    The acts complained of herein constitute violations of the fiduciary duties owed by Community Health's officers and directors and are incapable of ratification.

121.    Community Health has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein.  Despite the defendants having knowledge of the claims and causes of action raised by plaintiffs, the defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for Community Health any part of the damages Community Health suffered and will suffer thereby.  The Board's stubborn failure to investigate, correct and commence legal action against those responsible for the misconduct alleged herein in the face of heavy media and investor scrutiny on the matter, demonstrates that the Board is hopelessly incapable of independently addressing any legitimate demand.

122.    If Community Health's current and past officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Community Health.  However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Community Health against these defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause Community Health to sue themselves or certain of the officers of Community Health, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance, then the current directors will not cause Community Health to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

1182636_2

123.     Plaintiffs have not made any demand on the other shareholders of the Company to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     the Company is a publicly held company with tens of millions of shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duties

124.     Plaintiffs incorporate ¶¶1-123.

125.     Defendants owed and owe Community Health and its shareholders fiduciary obligations.  By reason of their fiduciary relationships, defendants specifically owed and owe Community Health the highest obligation of good faith, fair dealing, loyalty and due care and diligence in the management of the Company.

126.     Defendants have each violated and breached their fiduciary duties, including their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by causing or allowing the Company to engage in improper inpatient-admissions practices in order to maximize reimbursement payments from Medicare and other payer sources.  Defendants further breached their fiduciary duties by making, or allowing the Company to make, improper statements in their public filings concerning their Medicare and Medicaid revenues they knew were unwarranted and improperly obtained.

127.     Defendants Smith and Cash breached their duty of loyalty by selling over $33.8 million of their personally held Community Health stock on the basis of their knowledge of the improper information described above before that information was revealed to the Company's shareholders.  The information described above was proprietary, non-public information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which these defendants used for their own benefit when they sold the Company's stock.

128.     Further, the defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Community Health in a manner consistent with the operations of a publicly held corporation and under the applicable law.  They are each responsible for the gross and reckless management of Community Health and ignored their fiduciary responsibilities by causing the Company to engage in the unlawful conduct described herein.

129.     As a direct and proximate result of the defendants' failures to perform their fiduciary obligations, Community Health has sustained significant damages.

130.     Plaintiffs, as shareholders and representatives of the Company, seek damages and other relief for the Company.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Against defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties and aiding and abetting breaches of fiduciary duties;

B.     Directing Community Health to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Community Health and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the

1182636_2

Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies;

       (i)    a proposal to strengthen the Company's controls over Medicare reimbursement and billing;

       (ii)    a proposal to strengthen the Company's oversight of its admission procedures;

       (iii)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       (iv)    a provision to permit the shareholders of the Company to nominate at least three candidates for election to the Board; and

       (v)    a proposal to strengthen the Board's supervision of the accuracy and authenticity of the Company's financial records and bank statements;

C.    Awarding to Community Health restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by defendants;

D.    Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

E.    Granting such other and further equitable relief as this Court may deem just and proper.

# JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: October 25, 2016

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
BENNY C. GOODMAN III
ERIK W. LUEDEKE
JUAN CARLOS SANCHEZ

s/ Benny C. Goodman III
BENNY C. GOODMAN III

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JOHN C. HERMAN
Monarch Centre, Suite 1650
3424 Peachtree Road, N.E.
Atlanta, GA  30326
Telephone:  404/504-6500
404/504-6501 (fax)

DAVIES, HUMPHREYS, HORTON
  & REESE
WADE B. COWAN
85 White Bridge Road, Suite 300
Nashville, TN  37205
Telephone:  615/256-8125
615/242-7853 (fax)

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
ASHLEY R. RIFKIN
600 B Street, Suite 1900
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)

SULLIVAN, WARD, ASHER & PATTON, P.C.
MICHAEL J. ASHER
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI 48075-1000
Telephone: 248/746-0700
248/746-2760 (fax)

Attorneys for Plaintiffs

## VERIFICATION

I, Darris Garoufalis, Plan Manager for the Roofers Local No. 149 Pension Fund, acting on behalf of and with the consent of the Board of Trustees of Roofers Local No. 149 Pension Fund, hereby verify that I am familiar with the allegations in the Second Amended Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, that I have authorized the filing of the Second Amended Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, and that the foregoing is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:   October 25, 2016

DARRIS GAROUFALIS

1199785_1

## VERIFICATION

I, Roger Morgan, Chairman of the Board of Trustees of the Union of Plumbers and Pipefitters Local 630 Pension-Annuity Trust Fund, acting on behalf of and with the consent of the Board of Trustees of the Union of Plumbers and Pipefitters Local 630 Pension-Annuity Trust Fund, hereby verify that I am familiar with the allegations in the Second Amended Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, that I have authorized the filing of the Second Amended Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, and that the foregoing is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: 10/25/2016        _____
                                            ROGER MORGAN

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 25, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 25, 2016.

s/ Benny C. Goodman III
BENNY C. GOODMAN III

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: bennyg@rgrdlaw.com

**Mailing Information for a Case 3:11-cv-00489 Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Smith et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael J. Asher**
  masher@swappc.com

- **Alison C. Barnes**
  abarnes@robbinsrussell.com,mmadden@robbinsrussell.com,lpettit@robbinsrussell.com,cchasecarpino@robbinsrussell.com,dlerman@robbinsrussell.com,jherman@rob

- **Randall J. Baron**
  RandyB@rgrdlaw.com

- **James N. Bowen**
  jimbowen@rwjplc.com,dgibby@rwjplc.com

- **Wade B. Cowan**
  wcowan@dhhrplc.com

- **Peter Duffy Doyle**
  pdoyle@proskauer.com,LSOWDTN@proskauer.com

- **D. Alexander Fardon**
  alexfardon@comcast.net,daf@h3gm.com

- **Jonathan P. Farmer**
  jfarmer@fpwlegal.com,lneeley@fpwlegal.com,canello@fpwlegal.com

- **Nadeem Faruqi**
  nfaruqi@faruqilaw.com

- **Chantel Febus**
  cfebus@proskauer.com

- **Seth D. Fier**
  sfier@proskauer.com

- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com

- **Benny C. Goodman , III**
  bennyg@rgrdlaw.com,eluedeke@rgrdlaw.com,TravisD@rgrdlaw.com,michelew@rgrdlaw.com

- **Christy Goodman**
  c.w.goodmanlaw@gmail.com

- **John C. Herman**
  jherman@rgrdlaw.com,geubanks@rgrdlaw.com

- **Pedro A. Herrera**
  pherrera@sugarmansusskind.com

- **Michael J. Hynes**
  mhynes@hkh-lawfirm.com,bkeller@hkh-lawfirm.com,lhernandez@hkh-lawfirm.com

- **John R. Jacobson**
  jjacobson@rwjplc.com,mkillen@rwjplc.com,dbarnes@rwjplc.com

- **Beth A. Keller**
  bkeller@hkh-lawfirm.com

- **Erik W. Luedeke**
  eluedeke@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Eugene Mikolajczyk**
  genem@rgrdlaw.com

- **Gary A. Orseck**
  gorseck@robbinsrussell.com

- **Ashley R. Rifkin**
  arifkin@robbinsarroyo.com,notice@robbinsarroyo.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Brian J. Robbins**
  notice@robbinsarroyo.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Juan Carlos Sanchez**
  JSanchez@rgrdlaw.com

- **Kevin A. Seely**
  kseely@robbinsarroyo.com,notice@robbinsarroyo.com

- **Howard S. Susskind**
  hsusskind@sugarmansusskind.com

- **Michael L. Waldman**
  mwaldman@robbinsrussell.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`